1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No. 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:    ltfisher@bursor.com
              jsmith@bursor.com
              ykrivoshey@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY REVITCH, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DIRECTV, LLC, <br><br> Defendant. | Case No. 3:18-cv-01127-JCS <br><br> **PLAINTIFF'S OPPOSITION TO DIRECTV'S MOTION TO COMPEL ARBITRATION** <br><br> Date:        June 22, 2018 <br> Time:        9:30 a.m. <br> Courtroom:  G, 15th Floor <br><br> Judge:       Hon. Joseph C. Spero |

## TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ........................................................................................................1

II.  ARGUMENT ...........................................................................................................3

    A.  Resolution of this Dispute Is Governed By California Law........................3

    B.  AT&T Mobility's Arbitration Provision Does Not Extend to Claims
        Against DirecTV ..........................................................................................3

        1.  DirecTV's Interpretation is Unsupported by the Text of
            AT&T Mobility's Wireless Customer Agreement and AT&T
            Mobility's Conduct...........................................................................5

        2.  DirecTV's Interpretation Is Unreasonable in Light of the
            Circumstances that Existed at the Time of Contracting .................9

    C.  DirecTV's Arguments for Compelling Arbitration Lack Legal and
        Factual Support...........................................................................................12

        1.  As a Matter of Law, Dictionary or Statutory Definitions of
            the Word "Affiliate" Are Insufficient to Support Granting
            DirecTV's Motion .........................................................................13

        2.  DirecTV's Fallback Assertion that Any Ambiguities Must Be
            Resolved in its Favor Lacks Merit.................................................16

    D.  The Arbitration Agreement Is Unenforceable Under Civil Code
        § 3513 and *McGill* Because it Bars Public Injunctive Relief..................19

III.  CONCLUSION .......................................................................................................22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adams v. AT & T Mobility, LLC,*
 524 F. App'x 322 (9th Cir. 2013) ............................................... 16

*Adams v. AT&T Mobility, LLC,*
 816 F. Supp. 2d 1077 (W.D. Wash. Sept. 20, 2011) ....................... 16

*Andermann v. Sprint Spectrum L.P.,*
 785 F.3d 1157 (7th Cir. 2015) ................................................... 16

*AT&T Mobility LLC v. Concepcion,*
 563 U.S. 333 (2011) ................................................................. 20

*Azteca Const., Inc. v. ADR Consulting, Inc.,*
 121 Cal. App. 4th 1156 (Cal. App. 2004) ..................................... 21

*Blair v. Rent-A-Center, Inc.,*
 2017 WL 4805577 (N.D. Cal. Oct. 25, 2017) ............................... 19

*Brobeck, Phleger & Harrison v. Telex Corp.,*
 602 F.2d 866 (9th Cir. 1979) .................................................. 5, 7

*Brown v. DirecTV, LLC,*
 2013 WL 3273811 (C.D. Cal. June 26, 2013) ............................... 13

*Buchwald v. Superior Court,*
 254 Cal. App. 2d 347 (Cal. App. 1967) ....................................... 21

*Cabell v. Markham,*
 148 F.2d 737 (2d Cir. 1945) ..................................................... 14

*Cacique, Inc. v. Reynaldo's Mexican Food Co.,*
 2014 WL 505178 (C.D. Cal. Feb. 7, 2014) ............................... 15, 16

*Commodity Futures Trading Comm'n v. Savage,*
 611 F.2d 270 (9th Cir. 1979) .................................................... 21

*Crosby v. HLC Props., Ltd.,*
 223 Cal. App. 4th 597 (Cal. App. 2014) ........................................ 7

*DeMartini v. Johns,*
 2012 WL 4808488 (N.D. Cal. Oct. 9, 2012) ................................... 3

*Flintkote Co. v. Gen. Acc. Assur. Co.,*
 410 F. Supp. 2d 875 (N.D. Cal. Jan. 19, 2006) ............................. 14

*Gelow v. Central Pacific Mortg. Corp.,*
 560 F. Supp. 2d 972 (E.D. Cal. 2008) ......................................... 18

*Goldman, Sachs & Co. v. City of Reno,*
    747 F.3d 733 (9th Cir. 2014) .................................................................................. 16, 17, 18

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
    130 S. Ct. 2847 (2010) ................................................................................................ 17

*Hannabury v. Hilton Grand Vacations Co., LLC,*
    174 F. Supp. 3d 768 (W.D.N.Y. 2016) ........................................................................ 21

*Harris v. Gulf Ins. Co.,*
    297 F. Supp. 2d 1220 (N.D. Cal. 2003) ................................................................... 1, 14

*Hawker v. BancInsure,*
    2014 WL 1366201 (E.D. Cal. Apr. 7, 2014) ................................................................ 14

*Hemmings v. Tidyman's Inc.,*
    285 F.3d 1174 (9th Cir. 2002) .................................................................................... 20

*Horowitz v. AT&T Inc.,*
    2018 WL 1942525 (D.N.J. Apr. 25, 2018) ................................................................... 15

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.,*
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) ....................................................................... 12

*In re Tobacco Cases I,*
    186 Cal. App. 4th 42 (Cal. App. 2010) .......................................................................... 4

*In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing & Sales Practices Litig.,*
    2015 WL 1744339 (N.D. Cal. Apr. 15, 2015) ................................................................. 4

*Iqbal v. Ziadeh,*
    10 Cal. App. 5th 1 (Cal. App. 2017) .................................................................... 4, 14, 15

*Ironshore Specialty Ins. Co. v. 23andMe, Inc.,*
    2016 WL 3951660 (N.D. Cal. July 22, 2016) ................................................................ 13

*Kashmiri v. Regents of University of California,*
    156 Cal. App. 4th 809 (Cal. App. 2007) ..................................................................... 4, 9

*Levi Strauss & Co. v. Aetna Casualty & Surety Co.,*
    184 Cal. App. 3d 1479 (Cal. App. 1986) ......................................................................... 9

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes,*
    191 Cal. App. 4th 435 (Cal. App. 2010) ...................................................................... 13

*Marenco v. DirecTV,*
    233 Cal. App. 4th 1409 (2015) ...................................................................................... 3

*Mattel, Inc. v. MGA Enter., Inc.,*
    782 F. Supp. 2d 911 (C.D. Cal. Jan. 5, 2011) .............................................................. 18

*McArdle v. AT&T Mobility LLC,*
    2017 WL 4354998 (N.D. Cal. Oct. 2, 2017) .......................................................... 3, 19, 20

*McGill v. Citibank, N.A.,*
   2 Cal. 5th 945 (2017) ........................................................................ 3, 19, 20

*Miller v. Glenn Miller Prods., Inc.,*
   454 F.3d 975 (9th Cir. 2006) ............................................................... 1, 4, 9

*Mims v. Arrow Financial Services, LLC,*
   132 S. Ct. 740 (2012) .......................................................................... 21, 22

*Mundi v. Union Sec. Life Ins. Co.,*
   555 F.3d 1042 (9th Cir. 2009) ................................................................... 4

*Owens-Brockway Glass Container, Inc. v. International Ins. Co.,*
   1994 WL 559267 (E.D. Cal. Mar. 24, 1993) ........................................... 13

*Palantir Techs., Inc. v. Palantir.net, Inc.,*
   2011 WL 62411 (N.D. Cal. Jan. 7, 2011) ............................................... 13

*Parm v. Bluestem Brands, Inc.,*
   2017 WL 1193993 (D. Minn. Mar. 30, 2017) ......................................... 12

*Powers v. Dickson, Carlson & Campillo,*
   54 Cal. App. 4th 1102 (Cal. App. 1997) ................................................... 4

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,*
   388 U.S. 395 (1967) ............................................................................... 18

*Roberts v. AT&T Mobility LLC,*
   2018 WL 1317346 (N.D. Cal. Mar. 14, 2018) ...................................... 3, 20

*Russian Hill Improvement Assn. v. Board of Permit Appeals,*
   66 Cal.2d 34 (1967) ............................................................................... 13

*Sakkab v. Luxottica Retail N. Am., Inc.,*
   803 F.3d 425 (9th Cir. 2015) ................................................................. 20

*Sandquist v. Lebo Automotive, Inc.,*
   1 Cal. 5th 233 (2016) ........................................................................ 3, 4, 17

*Satterfield v. Simon & Schuster, Inc.,*
   569 F.3d 946 (9th Cir. 2009) ................................................................. 22

*Scott v. Continental Ins. Co.,*
   44 Cal. App. 4th 24 (Cal. App. 1996) ..................................................... 14

*Smith v. Altisource Solutions,*
   -- Fed. Appx. – 2018 WL 1136372 (6th Cir. Mar. 2, 2018) ..................... 17

*Smith v. Simmons,*
   409 Fed. Appx. 88 (9th Cir. 2010) ......................................................... 18

*Smith v. Steinkamp,*
   318 F.3d 775 (7th Cir. 2003) ................................................................. 12

*Thompson v. Borg-Warner Protective Servs., Corp.*,
    1995 WL 125440 (N.D. Cal. Mar. 13, 1995) ............................................................ 21

*U.S. v. Hernandez-Lopez*,
    594 Fed. Appx. 385 (9th Cir. 2015) ............................................................ 4, 9

*US Fax Law Ctr., Inc. v. iHire, Inc.*,
    362 F. Supp. 2d 1248 (D. Colo. 2005) ............................................................ 21

*Varela v. Lamps Plus, Inc.*,
    701 Fed. Appx. 670 (9th Cir. 2017) ............................................................ 3, 18

*Ward v. Goossen*,
    71 F. Supp. 3d 1010 (N.D. Cal. Oct. 15, 2014) ............................................................ 18

*Wexler v. AT & T Corp.*,
    211 F. Supp. 3d 500 (E.D.N.Y. 2016) ............................................................ 2, 11, 12

*Wince v. Easterbrooke Cellular Corp.*,
    681 F. Supp. 2d 688 (N.D.W.Va. 2010) ............................................................ 15

*Y.G. v. Riverside Unified School Dist.*,
    774 F. Supp. 2d 1055 (C.D. Cal. 2011) ............................................................ 21

**STATUTES**

47 U.S.C. § 227 ............................................................ 1

California Civil Code § 1641 ............................................................ 4, 5, 6

California Civil Code § 1654 ............................................................ 4, 17, 18

California Civil Code § 3513 ............................................................ 3, 19, 21, 22

California Corporation Code § 150 ............................................................ passim

**OTHER AUTHORITIES**

*Applications of AT&T, Inc. & DirecTV*,
    *No.* FCC 15-94 (July 28, 2015) ............................................................ 9

## I.   INTRODUCTION

DirecTV called Mr. Revitch as part of a robocall telemarketing campaign launched at non-DirecTV customers like him.  DirecTV's calls sparked numerous complaints by consumers and violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*  ("TCPA").  But that is nothing new.  Over the years, DirecTV has faced at least thirteen TCPA lawsuits and millions of dollars in fines by the Federal Trade Commission for telemarketing abuse.  Complaint, ¶¶ 10-14.

Here, DirecTV contends Mr. Revitch's claims are subject to arbitration because he happens to be an AT&T Mobility Wireless customer.  The arbitration provision in AT&T Mobility's Wireless Customer Agreement applies to "affiliates," and four years after Mr. Revitch entered into his agreement with AT&T Mobility Wireless, DirecTV became an indirect subsidiary of AT&T Mobility's parent company, AT&T Inc.  DirecTV contends it meets the definition of an "affiliate" in Black's Law Dictionary and California Corporation Code § 150, and therefore is an "affiliate" within the meaning of AT&T Mobility's Wireless Customer Agreement.

DirecTV's position ignores almost every rule of contract interpretation.  The "fundamental goal" of contract interpretation is to effectuate the mutual intent of the parties as it existed "at the time of contracting."  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006).  The notion that courts can ascertain the meaning of contract language merely by citing a dictionary or statutory definition is "a basic fallacy of contract interpretation."  *Harris v. Gulf Ins. Co.*, 297 F. Supp. 2d 1220, 1225 (N.D. Cal. 2003).  The primary evidence of mutual intent is the contract language, the contracting parties' course of conduct (i.e. AT&T Mobility and Mr. Revitch here), and the circumstances surrounding the execution of the agreement.  That evidence shows, among other things:

- ✓ AT&T Mobility's Wireless Customer Agreement defines the term "affiliates" as those who provide telephone services, and says nothing about DirecTV or home entertainment providers.
- ✓ AT&T Mobility tells its customers that its arbitration provision applies to telephone service providers, not DirecTV.

1      ✓   Mr. Revitch and AT&T Mobility entered into their agreement in 2011.  DirecTV did not

2            become a subsidiary of AT&T Inc. until 2015.  It therefore would have been impossible

3            for Mr. Revitch and AT&T Mobility to mutually intend "at the time of contracting" in

4            2011 that the arbitration agreement applied to DirecTV.  The arbitration provision does

5            not say it applies to unknown companies that may become indirect subsidiaries of the

6            parent company AT&T Inc. in the future, and whose services have nothing to do with

7            AT&T Mobility's Wireless Customer Agreement.

8      ✓   After DirecTV became a subsidiary of AT&T Inc., AT&T Mobility never amended the

9            arbitration provision or its customer information materials relating to arbitration, even

10            though it had a right to do so.  Instead, AT&T Mobility has always acted as if its

11            arbitration provision applies to affiliates that provide telephone services, not unrelated

12            home entertainment services.

13      ✓   AT&T Mobility's Wireless Customer Agreement sets forth mandatory notice

14            procedures that require customers to contact AT&T Mobility's headquarters in Atlanta,

15            Georgia before initiating arbitration.  The arbitration provision says nothing about how

16            to satisfy these requirements if someone wants to initiate arbitration against DirecTV,

17            which has its own headquarters in El Segundo, California.

18        DirecTV also does not cite any case adopting its interpretation.  Instead, it acknowledges

19 that in *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016), the court rejected nearly

20 same argument, based on the same arbitration agreement, when faced with nearly the same facts.

21 As the court in *Wexler* correctly held, no reasonable consumer would think that simply buying a

22 cell phone service would obligate him or her to arbitrate every possible dispute with unidentified

23 companies, foreign or domestic, that may eventually fall under AT&T Inc.'s growing corporate

24 umbrella.  DirecTV offers no legal basis to distinguish *Wexler*, and fails to address the reasoning of

25 that case.

26        Finally, even if the Court concludes the arbitration provision applies to DirecTV, its motion

27 should still be denied for a separate and independent reason.  At least two courts in this district

28

have recently held that AT&T Mobility's arbitration agreement is unenforceable because it violates California Civil Code § 3513, as interpreted by the California Supreme Court's decision in *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017).  *See McArdle v. AT&T Mobility LLC*, 2017 WL 4354998, at *3 (N.D. Cal. Oct. 2, 2017); *Roberts v. AT&T Mobility LLC*, 2018 WL 1317346 (N.D. Cal. Mar. 14, 2018).  There is no reason the Court should reach a different outcome here.

## II.   ARGUMENT

### A.   Resolution of this Dispute Is Governed By California Law

"In interpreting the validity and scope of an arbitration agreement, courts apply state law principles of contract formation and interpretation."  *DeMartini v. Johns*, 2012 WL 4808488, *4 (N.D. Cal. Oct. 9, 2012) (J. Spero); *see also, e.g.*, *Varela v. Lamps Plus, Inc.*, 701 Fed. Appx. 670, 672 (9th Cir. 2017) ("We apply state law contract principles in order to interpret the Agreement"); *Sandquist v. Lebo Automotive, Inc.*, 1 Cal. 5th 233, 244 (2016) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts").

Section 9.3.2 of AT&T's Wireless Customer Agreement provides that "[t]he law of the state of your billing address shall govern this Agreement, except to the extent that such law is preempted by or inconsistent with applicable federal law."  AT&T Wireless Agreement, § 9.3.2 (Ex. 1).[1]  Mr. Revitch's billing address is in California.  Revitch Decl., ¶ 2.  DirectTV appears to acknowledge that California law governs because it relies heavily on California state court cases, federal cases applying California law, and California Corp. Code § 150.  *See, e.g.*, Mtn. to Compel, at 6:16-21; 7:5-8.

### B.   AT&T Mobility's Arbitration Provision Does Not Extend to Claims Against DirecTV

"One of the cardinal principles of arbitration, whether under the FAA or California law, is that . . . a party cannot be required to submit to arbitration any dispute which he has not agreed to submit."  *Marenco v. DirecTV*, 233 Cal. App. 4th 1409, 1417 (2015) (internal quotation omitted).

---

[1] All exhibits referenced herein are attached to the concurrently-filed Declaration of Joel D. Smith.

The public policy favoring arbitration "does not apply to disputes the parties have not agreed to arbitrate." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (internal quotation omitted) (citing authorities).

In construing the arbitration provision in AT&T Mobility's Wireless Customer Agreement, "[t]he fundamental goal . . . is to give effect to the mutual intent of the parties as it existed at the time of contracting." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006) (applying California law); *see* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."). One party's "undisclosed intent or understanding is irrelevant to contract interpretation." *Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 8 (Cal. App. 2017).

The intent analysis focuses on the "usual and ordinary meaning of the language used and the circumstances under which the agreement was made." *Powers v. Dickson, Carlson & Campillo*, 54 Cal. App. 4th 1102, 1111 (Cal. App. 1997). "The language of a contract is to be read as a whole and given a reasonable interpretation, not an interpretation that would produce absurd results." *U.S. v. Hernandez-Lopez*, 594 Fed. Appx. 385, 386 (9th Cir. 2015); *Kashmiri v. Regents of University of California*, 156 Cal. App. 4th 809, 842 (Cal. App. 2007) ("the interpretation of a contract must be fair and reasonable, not leading to absurd conclusions"); *see also* Cal. Civ. Code § 1641. The parties' course of performance during the contract term also is "entitled to great weight" when determining the parties' intent at the time of contracting. *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 52 (Cal. App. 2010); *Miller*, 454 F.3d at 990 (subsequent conduct of the parties is relevant to determining the parties' intent at the time of contracting). Finally, if the interpretation of the contract is still uncertain after applying the above principles, California Civil Code § 1654 requires any ambiguities to "be construed against the drafter's interpretation and in favor of the nondrafter's interpretation." *Sandquist*, 1 Cal. 5th at 247; *see also* Cal. Civ. Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist").

This case presents a straightforward application of these principles.  As set forth below, DirecTV's position that it is an "affiliate" within the meaning of AT&T Mobility's Wireless Customer Agreement cannot be reconciled with the text of the agreement or AT&T Mobility's course of performance.  Its interpretation also leads to absurd results that Mr. Revitch and AT&T Mobility could not have mutually intended at the time of contracting.

> 1.   **DirecTV's Interpretation is Unsupported by the Text of AT&T Mobility's Wireless Customer Agreement and AT&T Mobility's Conduct**

The first evidence of the parties' intent is the language of the contract itself, with the "whole of the contract . . . to be taken together," and each part of the contract "helping to interpret the other."  Cal. Civ. Code § 1641.  Here, the arbitration provision does not define the term "affiliate."  There are five reasons, however, why the text of the Wireless Customer Agreement and AT&T Mobility's course of conduct rebut DirecTV's interpretation that it is an "affiliate" within the meaning of the agreement.

<u>First</u>, where feasible, courts "seek to interpret the contract in a manner that makes the contract internally consistent."  *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979).  Other references to the term "affiliate" in the AT&T Mobility Wireless Customer Agreement may shed light on the meaning of that term in the context of the arbitration provision. *See* Civil Code § 1641.  Section 1.9 of the agreement includes a definition of the term "affiliate," and the most natural reading of Section 1.9 is that the term applies to companies that provide telephone services.  Specifically, Section 1.9 refers to the fact that business customers can have their wireless phone bill included with their landline telephone bill if its landline telephone provider is affiliated with AT&T Mobility.  The provision states in pertinent part as follows:

> . . . You may receive Benefits because of your agreement to have the charges for your Services, billed ("Joint Billing") **by a wireline company affiliated with AT&T ("Affiliate")** or because you subscribe to certain services provided by an

1

2

Affiliate.  If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.[2]

3

4

5

6

7

8

9

10

11

12

13

AT&T Mobility's Wireless Customer Agreement, § 1.9 (Ex. 1) (emphasis added).  The Wireless Customer Agreement repeatedly refers to the term "wireline" as a landline phone service, in contrast to the wireless telephone services provided by AT&T Mobility.  *See id.*, at § 1.5 (". . . if you elect to receive your bills for your Services combined with your **wireline phone bill** . . . ");  § 4.6.1.5 ("Calls to wireless numbers . . .  may cost more than calls to **wireline numbers**.  If a customer calls an **overseas wireline number** and the call is forwarded to a wireless number, the customer will be charged for a call terminated to a wireless number"); § 5.9 ("Nation Plan and Individual Subscribers can place/receive calls to/from up to 5 . . . **wireline or wireless telephone** numbers without being charged for airtime minutes."); § 5.11.2 ("AT&T Unity Calling Minutes may be used when directly dialing or receiving calls from any other eligible AT&T **wireline or wireless phone number** from within your calling area").

14

15

16

17

18

19

Here, DirecTV admits in its motion to compel that it provides "satellite television services," not telephone services, and therefore DirecTV is not an "affiliate" under Section 1.9.  Mtn. to Compel, at 1:17; 9:12-13.  Under Civil Code § 1641, DirecTV presumably would not be an "affiliate" under the arbitration agreement either.  In contrast, DirecTV's interpretation requires the Court to find that the term "affiliate" has different meanings depending on where it appears in AT&T Mobility's Wireless Customer Agreement.

20

21

22

23

24

25

Second, other terms in the arbitration provision, as well as AT&T Mobility's conduct, provide further evidence against DirecTV's interpretation.  Section 2.2(3) of AT&T Mobility's Wireless Agreement encourages "non-lawyer" consumers to go to att.com/arbitration-information to better understand the arbitration process contemplated by the agreement.  *See* AT&T Mobility Wireless Agreement, Section 2.2(3) (Ex. 1) ("**You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information**") (emphasis

26

27

28

---

2 The term "Services" referenced in Section 1.9 means "wireless products, features, applications and services."  AT&T Mobility's Wireless Customer Agreement, at Introductory Paragraph.  The term "Benefits" referenced in Section 1.9 means "certain rate plans, discounts, credits, promotions, and other benefits."  *Id.* at § 1.9.

added).  That link takes consumers to a website page titled "Resolve a dispute with AT&T via arbitration."  AT&T Mobility Arbitration Information Website, (Ex. 2).  The website describes the arbitration process and identifies other telephone companies that AT&T Mobility contends are subject to its arbitration agreement:

> You can find a copy of our arbitration provision at att.com/disputeresolution. This document provides additional information on dispute resolution. Former AT&T customers as well as former customers of AT&T's predecessors (**Cingular Wireless, the former AT&T Wireless, BellSouth Mobility, Ameritech Mobile, Pacific Bell Wireless, SBMS, SNET Mobility, and SBC Wireless**) are entitled to have any dispute resolved under AT&T's current arbitration provision.

*Id.* (emphasis added).  The website that AT&T Mobility encourages consumers to read to better understand the arbitration provision has a lengthy step-by-step explanation of how arbitration works, and a long list of questions and answers.  *See id.*  The website says nothing about arbitrating claims against DirecTV or home entertainment television services, or what consumers must do if they want to initiate arbitration against DirecTV.  That fact furnishes further evidence that AT&T Mobility did not intend its arbitration provision to apply here.

      <u>Third</u>, AT&T Mobility's arbitration provision sets forth certain mandatory notice procedures, but those procedures are not set up to process arbitration claims against DirecTV.  As a result, DirecTV's interpretation contradicts the rule that courts should "'avoid interpretations that render any portion [of the contract] superfluous.'"  *In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing & Sales Practices Litig.*, 2015 WL 1744339, *10 (N.D. Cal. Apr. 15, 2015) (quoting *Crosby v. HLC Props., Ltd.*, 223 Cal. App. 4th 597, 604 (Cal. App. 2014).  Specifically, under Section 2.2(2), a consumer cannot initiate arbitration without first filling out and sending a specified "Notice Form," which must go to AT&T's office for Dispute Resolution in Atlanta, Georgia, not DirecTV's headquarters in El Segundo, California.  The Notice Form refers only to AT&T's policies and procedures for resolving disputes, and asks consumers who want to initiate arbitration to "briefly describe the relief that you would like from AT&T."  The form does not ask for information about the desired relief from DirecTV or any other company.  AT&T Mobility Notice of Dispute, (Ex. 3).

Notably, DirecTV requires its own customers to sign a very similar arbitration agreement, and DirecTV has its own address in El Segundo, California for processing the notice requirement in its arbitration agreement. *See* "Resolve a Dispute With DirecTV Via Arbitration, p. 2 (Ex. 4); DirecTV Notice Form (Ex. 5). If AT&T Mobility intended its arbitration provision to apply to DirecTV, then Section 2.2(2) presumably would either require consumers to contact DirecTV to provide the notice, or require AT&T Mobility to forward any notice it receives to DirecTV if the consumer wants to initiate arbitration against that company. The agreement, however, does not have either requirement. Thus, under DirecTV's interpretation, the pre-arbitration notice requirement of Section 2.2(2) is superfluous if a customer seeks to initiate arbitration against DirecTV for claims that have nothing to do with AT&T Mobility. On reply, DirecTV may argue that it is willing to waive the notice requirements or accept any notice Mr. Revitch may send to its headquarters in El Segundo, California. However, the fact that DirecTV would have to offer such modifications only confirms that the notice provision in Section 2.2 of AT&T Mobility's arbitration provision, as written, does not apply here and is superfluous under DirecTV's interpretation.

Fourth, in its motion to compel, DirecTV gushes over the supposedly consumer friendly provisions in AT&T Mobility's arbitration provision, such as the payment of arbitration fees, a $10,000 minimum award, and doubling attorney's fees. Mtn. to Compel. 3:19-4:20. But the arbitration provision does not say who—if anyone—is required to provide these benefits if a consumer pursues arbitration against DirecTV based on claims that have nothing to do with the AT&T Mobility Wireless Customer Agreement. *See* AT&T Mobility Wireless Customer Agreement, §§ 2.2(3)-(4) (Ex. 1). DirecTV is not a signatory to the agreement, so there is no reason a customer reading these provisions would reasonably think they apply to DirecTV.

Fifth, AT&T Mobility had the right under Section 1.3 to "change any terms . . . regarding [Mr. Revitch's] Services at any time." AT&T Mobility Wireless Services Agreement, at § 1.3 (Ex. 1). Similarly, Section 2.7 references AT&T Mobility's right to make "future change[s] to this arbitration provision." *Id.* at § 2.7. If AT&T Mobility intended to have the arbitration agreement

cover claims against DirecTV after DirecTV became an indirect subsidiary of AT&T Inc. in 2015, it could have revised the arbitration agreement, the above-described notice procedures, and its consumer information website to reflect that intent.  The fact that AT&T Mobility never did that furnishes additional evidence supporting denial of DirecTV's motion.

### 2.  DirecTV's Interpretation Is Unreasonable in Light of the Circumstances that Existed at the Time of Contracting

Even if the words of the arbitration provision in AT&T Mobility's Wireless Customer Agreement could be construed to support DirecTV's position, the circumstances surrounding the agreement's execution do not.

First, the "fundamental" issue is the parties' mutual intent "at the time of contracting." *Miller*, 454 F.3d at 990; Cal. Civ. Code § 1636.  Mr. Revitch and AT&T Mobility could not have mutually intend the arbitration provision to apply to DirecTV "at the time of contracting," because they entered into their agreement four years before DirecTV became an indirect subsidiary of AT&T Inc.  *See* Mtn. to Compel, at 6:10-11 (explaining Mr. Revitch signed the operative agreement in 2011); Mittelstead Decl., ¶¶ 5-8 (Dkt. No. 23-1) (same); *see also In re Applications of AT&T, Inc. & DirecTV*, No. FCC 15-94 (July 28, 2015).[3]  The arbitration provision in AT&T Mobility's Wireless Customer Agreement does not say that claims against unspecified companies that might become subsidiaries of AT&T Inc. years in the future are subject to arbitration, even if the claims have nothing to do with AT&T Mobility's Wireless Customer Agreement.  The Court cannot properly insert such language where it does not exist.  *Levi Strauss & Co. v. Aetna Casualty & Surety Co.*, 184 Cal. App. 3d 1479, 1486 (Cal. App. 1986) ("The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there").

Second, DirecTV's interpretation is contrary to the rule that contracts must be construed in a manner that is "fair and reasonable" and that will not lead to absurd results.  *Kashmiri*, 156 Cal. App. 4th at 842; *see also Hernandez-Lopez*, 594 Fed. Appx. at 386 (contracts are to be "given a

---

[3] *See also* AT&T Press Release, "AT&T Completes Acquisition of DirecTV," July 24, 2015, available at http://about.att.com/story/att_completes_acquisition_of_directv.html

reasonable interpretation, not an interpretation that would produce absurd results"). DirecTV emphasizes in its motion that the arbitration provision is extraordinarily broad, and covers "**all disputes and claims**" between Mr. Revitch and any unspecified affiliate. *E.g.* Mtn. to Compel, at 6:12-13 (bold in original). That interpretation necessarily leads to an absurd result that no reasonable consumer would contemplate at the time of contracting. Taken to its logical conclusion, DirecTV's position is that consumers who engage in the mundane act of buying a wireless service from AT&T Mobility sign away their rights to sue for anything—even wrongful death claims— against an ever-changing host of unnamed companies, foreign and domestic, that might fall under AT&T Inc.'s vast corporate umbrella, either now or in the future.

The unreasonableness of DirecTV's position is highlighted by the convoluted relationship between AT&T Mobility, LLC (the party to the arbitration agreement) and DirecTV, LLC (the defendant here) which is disclosed in the Declaration of Ann Mittelstead, submitted with DirecTV's motion to compel. *See* Dkt. No. 23-1. That organizational structure is depicted below in graphical form, with the relevant parties here identified in italics:



*See* Mittelstead Decl., ¶¶ 9-14 (Dkt. No. 23-1). The chart depicted above is just the tip of the iceberg given that, as of December 31, 2017, AT&T Inc. had at least twenty-seven "principal subsidiaries" scattered across the Western Hemisphere, not taking into account any other

1  subsidiaries not disclosed in its SEC filings.  *See* Feb. 17, 2017 SEC filing (Ex. 6).  Small wonder,

2  then, that when Mr. Revitch entered into AT&T Mobility's Wireless Customer Agreement in 2011,

3  he did not contemplate or intend that the arbitration provision would apply to claims against

4  DirecTV or to claims having nothing to do with his agreement with AT&T Mobility.  Revitch

5  Decl., ¶ 3.

6  　　　As to this issue, *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016), is instructive

7  because it addressed nearly the same facts and issues presented here.  The plaintiff in *Wexler* sued

8  AT&T Corp. under the Telephone Consumer Protection Act ("TCPA") for unsolicited calls related

9  to a "U-verse" television and internet service.  *Id.* at 502.  U-verse is offered by AT&T Corp., not

10  AT&T Mobility.  However, both companies are wholly-owned subsidiaries of AT&T Inc.  *Id.*

11  AT&T Corp. made the same argument that DirecTV makes here, based on the same language in

12  AT&T Mobility's arbitration agreement.  *See id.*

13  　　　The *Wexler* court concluded that AT&T Corp.'s interpretation failed under general

14  principles of contract formation.  As the court explained, "[n]otwithstanding the literal meaning of

15  the clause's language, no reasonable person would think that checking a box accepting the 'terms

16  and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally

17  every possible dispute he or she might have with the service provider, let alone all of the affiliates

18  under AT&T Inc.'s corporate umbrella—including those that provide services unrelated to cell

19  phone coverage.  Rather, a reasonable person would be expressing, at most, an intent to agree to

20  arbitrate disputes connected in some way to the service agreement with Mobility."[4]  *Id.* at 504.

21  　　　In its motion to compel arbitration, DirecTV contends that *Wexler* is distinguishable

22  because the calls at issue in that case were not intended for the plaintiff (Mtn. to Compel, at 10:8-

23  15), but that is a distinction without a difference.  The *Wexler* court's analysis focused on "what an

24  objective, reasonable person would have understood [the words of the contract] to convey" at the

25  time of contracting, not AT&T Mobility's or AT&T Corp.'s intent when the calls were made years

26

27  ───────────────

[4] Although the *Wexler* court applied New York law, it applied the same principles of contract
interpretation that govern here.  *See Wexler*, 211 F. Supp. 3d at 504.

28

later.  *Wexler*, 211 F. Supp. 3d at 504.  Although the court noted in the early part of the opinion that the plaintiff received a wrong number call, that fact had no bearing on the court's legal analysis.  *See id.*  DirecTV also contends in a footnote, and without explanation, that the *Wexler* court "imposed a heightened standard for the formation of arbitration agreements."  Mtn. to Compel, 10:23-28.  That is wrong.  The *Wexler* court emphasized that it was "apply[ing] ordinary state-law principles that govern the formation of contracts."  *Id.* at 504.

Wexler is not an outlier case.  Several other courts have reached similar decisions based on similar reasoning.  In *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012), another TCPA case, the defendant argued that when the plaintiff signed a contract for an engine oil change, he agreed to arbitrate "any and all disputes" with Jiffy Lube.  The district court rejected that argument, explaining the text messages at issue had nothing to do with an oil change.  Similarly, in *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003), the Seventh Circuit noted that if there were no limits to the arbitration agreement at issue in that case, "absurd results [would] ensue," such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated.  *See also Parm v. Bluestem Brands, Inc.*, 2017 WL 1193993, at \*9 (D. Minn. Mar. 30, 2017) ("To hold that the 2010 [arbitration] Agreement could reach any and all disputes regarding the actions of the parties and undefined third parties, even those claims wholly unrelated to the 2010 Agreement, would be an absurd result").  Like *Wexler*, these cases further demonstrate that DirecTV is advancing an overreaching interpretation of AT&T Mobility's arbitration agreement.

### C.   DirecTV's Arguments for Compelling Arbitration Lack Legal and Factual Support

DirectTV advances two arguments for the proposition that it is an "affiliate" within the meaning of AT&T Mobility's arbitration agreement: (1) DirecTV purportedly meets the definition of the term "affiliate" under Black's Law Dictionary and California Corporation Code § 150; and (2) to the extent the term "affiliate" is ambiguous, the ambiguity must be construed in favor of arbitration.  As set forth below, both arguments fail to support granting DirecTV's motion.

1

2

**1.     As a Matter of Law, Dictionary or Statutory Definitions of the Word "Affiliate" Are Insufficient to Support Granting DirecTV's Motion**

DirecTV's contention that it is an "affiliate" under Blacks' Law Dictionary and California Corporation Code § 150 fails for four reasons.

<u>First</u>, courts seek "to ascertain [a contract term's] plain meaning or the meaning a layperson would ordinarily attach to it." *Palantir Techs., Inc. v. Palantir.net, Inc.*, 2011 WL 62411, at *3 (N.D. Cal. Jan. 7, 2011).  Thus, "Black's Law Dictionary is of limited relevance given California's emphasis on interpreting [insurance] policies [or other consumer contracts] from a layman's perspective." *Ironshore Specialty Ins. Co. v. 23andMe, Inc*., 2016 WL 3951660, at *4 (N.D. Cal. July 22, 2016); *see also Brown v. DirecTV, LLC*, 2013 WL 3273811 (C.D. Cal. June 26, 2013) (adhesive arbitration clauses are viewed in light of the "reasonable expectations of the weaker or 'adhering' party").

The same reasoning applies to the statutory definition of "affiliate" under Corporation Code § 150.  *See Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 460 (Cal. App. 2010) ("because the court's task in interpreting a contract is to ascertain the intent of the parties," the definition of a "rule" under the Federal Procedures Act "is only relevant if the parties considered such federal law when they entered into the contract"); *Owens-Brockway Glass Container, Inc. v. International Ins. Co.*, 1994 WL 559267, at *3 (E.D. Cal. Mar. 24, 1993) ("a court is not bound by [CERCLA's] definition of its remedies where those definitions deviate from the mutual intent of the parties").  DirecTV does not contend Mr. Revitch contemplated Black's Law Dictionary or Corporation Code Cal. Corp. Code § 150 when agreeing to the arbitration provision in AT&T Mobility's Wireless Customer Agreement.  He did not.  Revitch Decl., ¶ 4.

<u>Second</u>, dictionary or statutory definitions cannot displace the rules of construction focusing on the terms of the contract, the context in which it was executed, and the parties who executed it.  That is why the California Supreme Court has warned that courts should not make "'a fortress out of the dictionary.'"  *Russian Hill Improvement Assn. v. Board of Permit Appeals*, 66

Cal.2d 34, 42 (1967) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945)).  "The use of a mere dictionary to solve a legal problem can be the subject of easy ridicule" when done "without regard to the document construed as a whole, the exact context of the language, other basic rules of contract interpretation, and the reasonable expectations of the [parties]."  *Scott v. Continental Ins. Co.*, 44 Cal. App. 4th 24, 30 n.4 (Cal. App. 1996); *see also Harris v. Gulf Ins. Co.*, 297 F. Supp. 2d 1220, 1225 (N.D. Cal. 2003) (the "conclusion that the meaning of [contract] language is to be discovered by citing one of the dictionary meanings of the key words a 'basic fallacy' of contract interpretation").  This is not to say that dictionaries are never useful, but DirecTV is going far out on a limb if it contends that Mr. Revitch or other layperson consumers are aware of and contemplate definitions set forth in esoteric dictionaries or statutes when reviewing adhesive arbitration agreements.  *See Hawker v. BancInsure*, 2014 WL 1366201, at *5 (E.D. Cal. Apr. 7, 2014) *aff'd* 685 Fed. Appx. 565 (9th Cir. 2017) ("Although examination of various dictionary definitions of a word will no doubt be useful," the court still "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language.").

Moreover, courts have applied these principles when construing the term "affiliate" in other contracts.  In *Iqbal*, 10 Cal. App. 5th at 9, for example, the California court of appeal surveyed numerous definitions of the word "affiliate," including Black's Law Dictionary, before concluding the defendant did not meet that definition.  Importantly, however, the court of appeal emphasized that its "attempt to define 'affiliate' [did] not end" after reviewing the dictionaries, because rules of contract interpretation require courts to focus on the contract as a whole and other applicable extrinsic evidence.  *See id.* at 10–12 (analyzing other terms of the contract, the negotiation history, and subsequent conduct).  Similarly, in *Flintkote Co. v. Gen. Acc. Assur. Co.*, 410 F. Supp. 2d 875, 887-88 (N.D. Cal. Jan. 19, 2006), the district court agreed that the definition of "affiliate" in Black's Law Dictionary and other dictionaries "directly supported" plaintiff's position, but that fact was not dispositive because it did not take into consideration the entirety of the contract and the context of its execution.

1    Third, even if dictionary and statutory definitions were relevant here, DirecTV does not

2    meet the definition of an "affiliate" under Blacks' Law Dictionary and California Corporation

3    Code § 150.[5]  DirecTV's own authority explained that the definitions of "affiliate" in Blacks' Law

4    Dictionary and California Corporation Code § 150 "include some element of control."  *Cacique,*

5    *Inc. v. Reynaldo's Mexican Food Co.*, 2014 WL 505178, at *5 (C.D. Cal. Feb. 7, 2014).  DirecTV

6    does not contend that AT&T Mobility exercises control over it, or that the parent company, AT&T

7    Inc., exercises control over AT&T Mobility or DirecTV.  AT&T Inc. has frequently represented in

8    courts that it is just a holding company that exercises no control over AT&T Mobility or its other

9    subsidiaries.  *See, e.g., Wince v. Easterbrooke Cellular Corp.*, 681 F. Supp. 2d 688, 690

10   (N.D.W.Va. 2010) ("AT & T Inc. claims it is a 'non-resident holding company that conducts no

11   business and sells no services or products in West Virginia (or elsewhere)'").  In December 2017,

12   for example, AT&T Inc. emphatically argued there was "**no evidence of AT&T Inc.'s control**

13   **over any AT&T entity**" when arguing it was not subject to jurisdiction in New Jersey under an

14   alter ego theory.  AT&T Inc. Reply Brief in *Horowitz v. AT&T Inc.*, p.6 [Ex. 7] (emphasis in

15   original); *see also Horowitz v. AT&T Inc.*, 2018 WL 1942525 *23 (D.N.J. Apr. 25, 2018) (holding

16   AT&T Inc. "is purely a holding company" that does not control its subsidiaries).

17          Fourth, DirecTV is unable to cite a single case holding that AT&T Mobility's arbitration

18   agreement applies to claims against DirecTV, and the cases it does cite do not support its position.

19   DirecTV first notes that the district court in *Cacique, Inc.*, 2014 WL 505178, at *5, referenced

20   Black's Law Dictionary and Corporation Code § 150, but that case contradicts DirecTV's position

21   here.  The district court specifically held that "the contracting parties' intent and prior dealings can

22   supersede strict legal definitions such as these when it comes to contract interpretation."  *Id.* at 5.

23   And, as noted above, *Cacique* also contradicts DirecTV's position because the court found that the

24

25   _____

26   [5] *See*, Black's Law Dictionary (10th ed. 2014) ("A corporation that is related to another corporation
     by shareholdings **or other means of control**; a subsidiary, parent or sibling corporation"); Cal

27   Corp. Code. § 150 ("A corporation is an 'affiliate' of, or a corporation is 'affiliated' with, another
     specified corporation if it directly, or indirectly through one or more intermediaries, **controls, is**

28   **controlled by or is under common control with the specified corporation**.")

definition of "affiliate" requires an element of control that DirecTV does not contend is present here.  *See id.*

DirecTV also cites *Adams v. AT & T Mobility, LLC*, 524 F. App'x 322 (9th Cir. 2013), and *Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1158 (7th Cir. 2015), but unlike *Cacique* and the other decisions cited above, neither case addressed the definition of "affiliate" or the limited role dictionaries play in contract interpretation.  Moreover, both decisions are distinguishable because the plaintiffs advanced interpretations that contradicted the plain language of the contracts.  In *Adams*, the arbitration provision at issue applied to the "parent companies" of New Cingular, and "there [was] no dispute that ATTM was New Cingular's parent company."  *Adams v. AT&T Mobility, LLC*, 816 F. Supp. 2d 1077, 1083 (W.D. Wash. Sept. 20, 2011); *see also Adams*, 524 Fed. Appx. at 324 (noting that "New Cingular's Wireless parent company [is] ATTM.").  The plaintiff in *Adams* unsuccessfully argued that only one company could qualify as a "parent company," when in fact the text of the arbitration agreement clearly referred to "parent <u>companies</u>" in the plural.  *Adams*, 816 F. Supp. 2d at 1083.  Similarly, in *Andermann*, the dispute turned on whether plaintiff's phone company U.S. Cellular had a contractual right to assign its agreement to Sprint, where the plain text of the agreement said it did.  *Andermann*, 785 F.3d at 1158.  Here, in contrast, Mr. Revitch's interpretation is consistent with the language of AT&T Mobility's Wireless Customer Agreement, AT&T Mobility's course of conduct, and the circumstances at the time of execution in 2011.  Conversely, DirecTV is the party advancing an interpretation inconsistent with the relevant evidence.

### 2.   DirecTV's Fallback Assertion that Any Ambiguities Must Be Resolved in its Favor Lacks Merit

DirecTV argues that "even if there were uncertainty as to whether [Mr.] Revitch's claims are arbitrable . . . any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Mtn. to Compel, at 10:16-11:1.  That argument fails for two reasons.

<u>First</u>, DirecTV overstates the law.  As the Ninth Circuit explained in *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741-42 (9th Cir. 2014) ("*Goldman*"), the policy of resolving

ambiguities in favor of arbitration, "is merely an acknowledgment of the FAA's commitment to

overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such

agreements **upon the same footing as other contracts**." *Id.* at 742.  (Internal quotation omitted)

(Emphasis in original).  "Accordingly, the Supreme Court [has] never held that this policy

overrides the principle that a court may submit to arbitration only those disputes . . . that the parties

have agreed to submit.  Nor [has the Court] held that courts may use policy considerations as a

substitute for party agreement." *Id.* (internal quotations and citations omitted).  *See also Smith v.*

*Altisource Solutions*, -- Fed. Appx. – 2018 WL 1136372, *4 (6th Cir. Mar. 2, 2018) ("the federal

presumption in favor of arbitration cannot be used as a means of rewriting the arbitration clause to

encompass a dispute that the parties did not intend for arbitration and that the contract does not

anticipate").

　　　　　Equally important, the Ninth Circuit explained that even where the presumption applies,

"we adhere to the presumption and order arbitration only where the presumption is not rebutted."

*Id.* at 743 (citing, e.g., *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 130 S. Ct. 2847, 2858-60

(2010)).  Here, the presumption cannot apply (or at the very least is rebutted) given that DirecTV's

position is inconsistent with the text of the agreement and relevant extrinsic evidence of the parties'

intent.  *See* Section II(B)(1)-(2) above.

　　　　　<u>Second</u>, DirecTV's position is contrary to Civil Code § 1654 and the rule that "ambiguities

in written agreements are to be construed against their drafters." *Sandquist*, 1 Cal. 5th at 247; *see*

*also* Cal. Civ. Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the

language of a contract should be interpreted most strongly against the party who caused the

uncertainty to exist.").  The California Supreme Court has held that "[t]his general principle of

contract interpretation applies equally to the construction of arbitration provisions." *Sandquist*, 1

Cal. 5th at 248.  "Where the drafter of a form contract has prepared an arbitration provision whose

application to a particular dispute is uncertain, ordinary contract principles require that the

provision be construed against the drafter's interpretation and in favor of the nondrafter's

interpretation." *Id.*  The Ninth Circuit and district courts have followed *Sandquist* or Civil Code

§ 1654 when construing ambiguous arbitration agreements against those who draft them. *See*, *e.g.*, *Varela*, 701 Fed. Appx. at 672 (construing an ambiguous arbitration agreement against the employer who drafted the agreement); *Gelow v. Central Pacific Mortg. Corp.*, 560 F. Supp. 2d 972, 981 (E.D. Cal. 2008) (same); *Ward v. Goossen*, 71 F. Supp. 3d 1010, 1016 (N.D. Cal. Oct. 15, 2014) (Cal. Civ. Code § 1654 supported narrow interpretation of arbitration agreement).[6]

As to this issue, DirecTV will likely argue that the policy favoring arbitration overrides Civil Code § 1654 (which codifies the common law rule of construction, *contra proferentem*). *See Smith v. Simmons*, 409 Fed. Appx. 88, 90 (9th Cir. 2010) (explaining § 1654). However, there would be no way to reconcile that position with other rules governing arbitration. The Supreme Court has repeatedly held that arbitration provisions are to be put on the "same footing" as ordinary contracts, so that they are "as enforceable as other contracts, **but not more so**." *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404, n.12 (1967) (emphasis added); *accord Goldman*, 747 F.3d at 742. Ignoring Civil Code § 1654 in the case of arbitration agreements would put those agreements on a different footing than other contracts. Moreover, as noted above, the Supreme Court and Ninth Circuit have held that the parties' mutual intentions control over any policy favoring arbitration. *E.g.*, *Goldman*, 747 F.3d at 741-42. When a consumer had no role in drafting a purportedly ambiguous clause, there is no reason to think an interpretation favoring arbitration is more likely to reflect that consumer's intentions at the time of contracting. Finally, if courts adopt DirecTV's argument, that will incentivize companies to be vague about the reach of arbitration in their form contracts, thereby creating new opportunities to mislead consumers.

//

//

//

---

[6] This rule also applies where, as here, a third party seeks to step into the drafter's shoes by claiming benefits and rights under the agreement at issue. *See Mattel, Inc. v. MGA Enter., Inc.*, 782 F. Supp. 2d 911, 993 (C.D. Cal. Jan. 5, 2011) (applying § 1654 against a party who claimed it was a "third party beneficiary to the agreement"). In that situation, the third party interposing its own interpretation of the contract is "the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

**D.     The Arbitration Agreement Is Unenforceable Under Civil Code § 3513 and *McGill* Because it Bars Public Injunctive Relief**

Section 2.2(6) of AT&T Mobility's Wireless Customer Agreement allows injunctive relief, if at all, only on an individual basis, and bars injunctive relief that would benefit the public at large. Specifically, the provision provides as follows:

> The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.  YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.  If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

AT&T Mobility Wireless Customer Agreement, § 2.2(6) (capitalized text in original).  Mr. Revitch seeks injunctive relief on behalf of a putative class in connection with his claim under the TCPA. *See* Complaint, ¶¶ 1, 23, 32, Prayer for Relief (Dkt. No. 1).  If Mr. Revitch were forced to arbitrate his claims, however, then Section 2.2(6) would preclude him from seeking classwide injunctive relief.  As explained below, that limitation is contrary to public policy under California Civil Code § 3513 and the California Supreme Court's decision in *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017).  Moreover, the last sentence of Section 2.2(6) contains a so-called "poison pill" provision that renders the entire arbitration agreement "null and void" if any part of Section 2.2(6) is unenforceable.  These facts furnish another reason to deny DirecTV's motion.

California Civil Code § 3513 provides that "[a]ny one may waive the advantage of a law intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement."  In *McGill*, the California Supreme Court applied § 3513 when it held that arbitration agreements purporting to waive the right to seek public injunctive relief in any forum are contrary to California public policy and thus unenforceable under California law.  *See McArdle v. AT&T Mobility LLC*, 2017 WL 4354998, at *3 (N.D. Cal. Oct. 2, 2017) *appeal filed* Nov. 2, 2017 (explaining *McGill*); *see also Blair v. Rent-A-Center, Inc.*, 2017 WL 4805577, at *3 (N.D.

Cal. Oct. 25, 2017), *appeal filed* Oct. 30, 2017 ("in *McGill* . . . the California Supreme Court determined that [the UCL] provide[s] injunctive remedies that were by and large for the benefit of the public, and as such could not be waived by contract.").

At least two courts in this district have already applied *McGill* to the same arbitration agreement at issue here. *See McArdle*, 2017 WL 4354998, at *3; *Roberts v. AT&T Mobility LLC*, 2018 WL 1317346 (N.D. Cal. Mar. 14, 2018). Both cases involved claims against AT&T Mobility. In both cases, the courts had previously granted AT&T Mobility's motion to compel arbitration, but then reconsidered after the California Supreme Court issued its decision in *McGill*. As the court explained in *McArdle*, "*McGill*'s holding that predispute waivers of public injunctive relief are contrary to California public policy is binding on this Court." *McArdle*, 2017 WL 4354998, at *3; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002) ("In interpreting state law, federal courts are bound by the pronouncements of the state's highest court."). Later in *Roberts*, 2018 WL 1317346, at *5–7, Judge Chen analyzed the *McGill* and *McArdle* decisions at length, and reached the same conclusion after determining the decisions were consistent with Supreme Court and Ninth Circuit authorities governing arbitration agreements. *See id.* at *5-7 (discussing, *e.g.*, *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425 (9th Cir. 2015) and *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)).

Moreover, both courts rejected AT&T Mobility's argument for severing Section 2.2(6)'s bar on injunctive relief, so that plaintiffs would be required to pursue the merits of their claims in arbitration, and then later seek injunctive relief in the courts. *Id.* at *8; *McArdle*, 2017 WL 435998 at *4-5. That argument is contrary to the last sentence of Section 2.2(6), which states that "[i]f this specific provision is found to be unenforceable [i.e., Section 2.2(6)], then the entirety of this arbitration provision shall be null and void." AT&T Mobility Wireless Customer Agreement, § 2.2(6). *McArdle*, 2017 WL 4354998, at *5 ("The language of the 'poison pill' sentence unambiguously provides that 'the entirety of this arbitration provision shall be null and void' if subsection 2.2(6), waiving claims and relief on behalf of other persons, is found to be unenforceable"); *accord Roberts*, 2018 WL 1317346, at *8–9.

Finally, although *McGill* did not involve claims under the TCPA, that is a distinction without a difference.  <u>First</u>, Civil Code § 3513 does not say it applies only to claims brought under California statutes.  *See Y.G. v. Riverside Unified School Dist.*, 774 F. Supp. 2d 1055, 1065 (C.D. Cal. 2011) (§ 3513 applied to federal action under the Individuals with Disabilities Education Act); *cf. Thompson v. Borg-Warner Protective Servs., Corp.*, 1995 WL 125440, *3 (N.D. Cal. Mar. 13, 1995) (holding similar statute Civil Code § 1668 barred waiver of claims under the federal Americans with Disabilities Act).  Construing § 3513 to be inapplicable to federal statutes would contradict the rule that remedial statutes are to be liberally construed.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 280 (9th Cir. 1979) ("remedial statutes should be liberally construed and should be interpreted (when that is possible) in a matter tending to discourage attempted evasions by wrongdoers."); *Buchwald v. Superior Court*, 254 Cal. App. 2d 347, 354 (Cal. App. 1967) ("Remedial statutes should be liberally construed to effect their objects and suppress the mischief at which they are directed.")

<u>Second</u>, Civil Code § 3513 prohibits a waiver of statutory rights in situations where the "public benefit [of the statute] is one of its primary purposes."  *Azteca Const., Inc. v. ADR Consulting, Inc.*, 121 Cal. App. 4th 1156, 1166 (Cal. App. 2004) (internal quotation omitted). "[T]he primary purpose of a private action under Section 227(b) and 227(c) of the TCPA is to redress wrongs to the public as opposed to individual plaintiffs."  *Hannabury v. Hilton Grand Vacations Co., LLC*, 174 F. Supp. 3d 768, 775 (W.D.N.Y. 2016).  Thus, "[c]ourts considering the TCPA have uniformly concluded it was enacted to address a public harm."  *US Fax Law Ctr., Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248, 1253 (D. Colo. 2005).  As the Supreme Court explained in *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 744-45 (2012), Congress specifically enacted the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology."  The *Mims* Court went onto note that Senator Hollings, the TCPA's sponsor, set forth his motivations for the bill explicitly on the Senate floor: "'Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the

wall.'"  *Id.* at 752 (quoting 137 Cong. Rec. 30821-30822 (1991)); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) ("The TCPA was enacted in response to an increasing number of consumer complaints' that 'unsolicited, automated telephone calls' were a 'nuisance and an invasion of privacy.").  In short, the application of § 3513 and *McGill* furnishes a separate basis to deny DirecTV's motion.

## III.  CONCLUSION

For the foregoing reasons, Mr. Revitch asks the Court to deny DirecTV's motion to compel arbitration in its entirety.

Dated:  May 29, 2018

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  ___*/s/ Joel D. Smith*___
Joel D. Smith

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Yeremey O. Krivoshey (State Bar No.295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
        jsmith@bursor.com
        ykrivoshey@bursor.com

*Attorneys for Plaintiff*