MAYER BROWN LLP
Anne M. Selin (SBN 270634)
*aselin@mayerbrown.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112
Telephone: (650) 331-2000

Archis A. Parasharami (*pro hac vice*)
*aparasharami@mayerbrown.com*
Daniel E. Jones (*pro hac vice* to be filed)
*djones@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000

*Attorneys for Defendant DIRECTV, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEREMY REVITCH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DIRECTV, LLC,<br><br>Defendant. | Case No. 3:18-cv-01127-JCS<br><br>**DEFENDANT DIRECTV, LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION**<br><br>Date: July 20, 2018<br>Time: 9:30 am.<br>Courtroom: G, 15th Floor<br><br>Judge: Hon. Joseph C. Spero |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ....................................................................................................................................... 2

    A.    DIRECTV Is Entitled To Enforce Revitch's Arbitration Agreement With AT&T Mobility. ......................................................................................................... 2

        1.    DIRECTV and AT&T Mobility are "affiliates" under the plain and ordinary meaning of that term. ............................................................................ 2

        2.    Revitch's attempts to redefine the term "affiliate" fail. ............................. 4

    B.    Revitch's Claims Against DIRECTV Fall Within The Scope Of His Arbitration Agreement. ............................................................................................................... 7

    C.    Revitch's Reliance On California's *McGill* Rule Is Misplaced. .......................... 10

CONCLUSION ................................................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. AT&T Mobility, LLC*,
   524 F. App'x 322 (9th Cir. 2013) ................................................................................. 6, 10

*Alea London Ltd. v. Am. Home Servs., Inc.*,
   638 F.3d 768 (11th Cir. 2011) ........................................................................................ 11

*Andermann v. Sprint Spectrum LP*,
   785 F.3d 1157 (7th Cir. 2015) ....................................................................................... 6, 8

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ........................................................................................ 1, 8, 11, 12

*Credit Suisse First Boston Mortg. Capital v. Danning, Gill, Diamond & Kollitz*,
   178 Cal.App.4th 1290 (2009) ........................................................................................... 4

*E.M.M.I., Inc. v. Zurich Am. Ins. Co.*,
   84 P.3d 385 (Cal. 2004) .................................................................................................... 2

*Epic Sys. Corp. v. Lewis*,
   2018 WL 2292444 (U.S. May 21, 2018) ...................................................................... 2, 12

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
   109 Cal.App.4th 944 (2003) ............................................................................................. 3

*Hannabury v. Hilton Grand Vacations Co.*,
   174 F. Supp. 3d 768 (W.D.N.Y. 2016) ........................................................................... 11

*Iqbal v. Ziadeh*,
   10 Cal.App.5th 1, 10 (2017) ............................................................................................. 3

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
   847 F. Supp. 2d 1253 (S.D. Cal. 2012) ............................................................................ 8

*Kindred Nursing Centers Limited Partnership v. Clark*,
   137 S. Ct. 1421 (2017) ..................................................................................................... 9

*Kristian v. Comcast Corp.*,
   446 F.3d 25 (1st Cir. 2006) ............................................................................................ 10

*Laster v. T-Mobile USA, Inc.*,
   2008 WL 5216255 (S.D. Cal. Aug. 11, 2008) ............................................................... 11

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) ......................................................................................................... 10

*McGill v. Citibank, N.A.*,
   393 P.3d 85 (Cal. 2017) .................................................................................. 2, 10, 11, 12

*Mey v. DIRECTV, LLC*,
  No. 17-cv-179, Dkt. No. 28 (Apr. 25, 2018), *appeal filed*, No. 18-01534 (4th Cir.) ..........................................................................................................................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)............................................................................................................9

*Northstar Fin. Advisors, Inc. v. Schwab Investments*,
  781 F. Supp. 2d 926 (N.D. Cal. 2011) ............................................................................6

*Parm v. Bluestem Brands, Inc.*,
  2017 WL 1193993 (D. Minn. Mar. 30, 2017) ................................................................8

*Powers v. Dickson, Carlson & Campillo*,
  54 Cal.App.4th 1102 (1997) ...........................................................................................2

*Reyes v. Lincoln Auto. Fin. Servs.*,
  861 F.3d 51 (2d Cir. 2017).............................................................................................8

*Sandquist v. Lebo Automotive, Inc.*,
  376 P.3d 506 (Cal. 2016) .............................................................................................10

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ......................................................................................3, 6

*Smith v. Steinkamp*,
  318 F.3d 775 (7th Cir. 2003) ..........................................................................................8

*Texas Molecular Ltd. P'Ship v. Am. Int'l Specialty Lines Ins. Co.*,
  424 F. App'x 354 (5th Cir. 2011) ...................................................................................3

*US Fax Law Ctr., Inc. v. iHire, Inc.*,
  362 F. Supp. 2d 1248 (D. Colo. 2005).........................................................................11

*Varela v. Lamps Plus, Inc.*,
  701 F. App'x 670 (9th Cir. 2017), *cert. granted*, 2018 WL 398496 (U.S. Apr. 30, 2018) .......................................................................................................................10

*Wexler v. AT&T Corp.*,
  211 F. Supp. 3d 500 (E.D.N.Y. 2016) ...................................................................7, 8, 9

**Statutes, Rules and Regulations**

47 U.S.C. § 227(b)(1)(A).................................................................................................8

Cal. Civ. Code § 1654.....................................................................................................9

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ...................................................................3

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (2002)...................................3

Revitch's opposition does not deny that DIRECTV has established these undisputed facts and principles:

- Revitch accepted the terms of AT&T Mobility's Wireless Customer Agreement by signing under an acknowledgment that "I have reviewed and agree to the rates, terms, and conditions for the wireless products and service described in the Wireless Customer Agreement (including limitation of liability and *arbitration provisions*)."
- That Agreement includes a broad arbitration provision that expressly encompasses all statutory claims and claims "relating to advertising."
- The arbitration provision also expressly covers all disputes against AT&T Mobility's "affiliates" and "subsidiaries."
- The substance of AT&T's arbitration provision is fully enforceable under the Federal Arbitration Act, and the Supreme Court has recognized that customers are "*better off under their arbitration agreement with AT&T than they would*" be "as participants in a class action." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011) (quotation marks omitted).

These undisputed points require Revitch to arbitrate his TCPA claim against DIRECTV.

Revitch's arguments in opposition to DIRECTV's motion are unconvincing. Although Revitch seeks to deny that DIRECTV can invoke the arbitration agreement between him and AT&T Mobility, there can be no doubt that DIRECTV is an "affiliate" of AT&T Mobility under the plain and ordinary meaning of that term, and all disputes involving AT&T's affiliates are expressly covered by the arbitration agreement.

Revitch also tries to argue that the scope of his arbitration agreement should be narrowly limited to cover only claims relating to AT&T Mobility's provision of cellular telephone service. But that argument cannot be squared with the express language of the arbitration agreement; in any event, Revitch has no response to our showing that his claims relate to his wireless service contract because that Agreement contains specific language demonstrating Revitch's consent to be contacted "about our Services or other matters we believe may be of interest to you." Decl. of Ann Mittelstead Ex. 4 § 1.10. Accordingly, his claims are subject to arbitration even on his own

cramped reading of the scope of AT&T's arbitration provision. And although the merits of Revitch's claim are for an arbitrator to decide, providing such contractual consent is commonplace: Businesses routinely seek and obtain permission to contact customers about other services that they and their affiliates provide.

Finally, Revitch attempts to invoke California's rule mandating the availability of public-injunction proceedings under the state Unfair Competition Law and Consumers Legal Remedies Act. *See McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017)). But that argument is doubly misplaced: First, class-wide injunctive relief under the TCPA is not a public injunction within the meaning of *McGill*, so Revitch's argument fails from the start. Second, the *McGill* rule is preempted by the FAA in any event. As Revitch recognizes, AT&T is currently litigating that issue before the Ninth Circuit, and AT&T's arguments are even more powerful in light of the Supreme Court's recent holding reiterating that "the ***individualized*** nature of [] arbitration proceedings" is "one of arbitration's fundamental attributes," which the FAA "seems to protect ***pretty absolutely***." *Epic Sys. Corp. v. Lewis*, 2018 WL 2292444, at *6-7 (U.S. May 21, 2018) (emphasis added).

## ARGUMENT

**A. DIRECTV Is Entitled To Enforce Revitch's Arbitration Agreement With AT&T Mobility.**

*1. DIRECTV and AT&T Mobility are "affiliates" under the plain and ordinary meaning of that term.*

As we showed in our opening brief, the text of Revitch's arbitration agreement permits DIRECTV to enforce it as an "affiliate" of AT&T Mobility. Mot. 6-7. Revitch's arguments to the contrary are unavailing.

As an initial matter, Revitch's repeated assertion that he did not subjectively "contemplate or intend" to agree to arbitrate claims against DIRECTV (Revitch Decl. ¶ 3; *see also* Opp. 11, 13-14) is irrelevant. As he elsewhere acknowledges, determining the intent of the parties is an ***objective*** analysis that "focuses on the 'usual and ordinary meaning of the language used.'" Opp. 4 (quoting *Powers v. Dickson, Carlson & Campillo*, 54 Cal.App.4th 1102, 1111 (1997)); *see also, e.g.*, *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 84 P.3d 385, 389 (Cal. 2004)

(courts infer mutual intent from the "clear and explicit meaning" of the language in the agreement, "interpreted in [its] ordinary and popular sense") (quotation marks omitted).  In other words, "California recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 956 (2003).

The plain meaning of the term "affiliate" supports DIRECTV's position.  Revitch asserts that Black's Law Dictionary and a California statute amount to "esoteric dictionaries and statutes" that offer little guidance.  Opp. 13-14.  But there is nothing remarkable or "esoteric" about those definitions.  And it should therefore come as no surprise that ordinary dictionaries offer similar definitions.  Indeed, relying on one such definition, the Ninth Circuit has specifically held that "the plain and ordinary meaning of 'affiliate'" is "'a company effectively controlled by another or ***associated with others under common ownership*** or control.'"  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (cited at Opp. 22) (emphasis added; quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (2002)); *accord, e.g.*, *Texas Molecular Ltd. P'Ship v. Am. Int'l Specialty Lines Ins. Co.*, 424 F. App'x 354, 357 (5th Cir. 2011) (quoting same definition as the "plain, ordinary, and generally accepted meaning" of "affiliate") (quotation marks omitted).

Revitch contends that DIRECTV is not affiliated with AT&T Mobility because their shared parent AT&T Inc. is a holding company (Opp. 15) but that argument is frivolous in light of *Satterfield*, which holds that "common ownership" is a basis for an affiliate relationship.  569 F.3d at 955; *see also* Mot. 6-7.  Moreover, Revitch does not dispute that AT&T Mobility and DIRECTV are "sibling corporation[s]" within the AT&T family of companies—a commonly-used way to define affiliates.  *Affiliate*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Indeed, one of Revitch's own cases notes the "common meaning" of an "affiliate" as "an associate of another person or organization; ***a fellow member of a larger body***"—like the AT&T family of companies here.  *Iqbal v. Ziadeh*, 10 Cal.App.5th 1, 10 (2017) (cited at Opp. 14) (emphasis added; quoting online version of OXFORD ENGLISH DICTIONARY).

In short, DIRECTV is an "affiliate" of AT&T Mobility.

>   2.   *Revitch's attempts to redefine the term "affiliate" fail.*

Revitch's additional attempts to inject uncertainty into the term "affiliate" fall flat. Revitch first notes that, in a separate section of his Wireless Customer Agreement, the Agreement uses the defined, capitalized term "Affiliate" to mean "a wireline company affiliated with AT&T," and he says that the term "affiliates" in his arbitration provision should have the same limited meaning. Opp. 5-6. But that argument does not withstand minimal scrutiny. The narrow use of the defined term "Affiliate" is found in a section titled "<u>Are There Business or Government Benefits?</u>" and states in pertinent part that "You may receive Benefits [defined to mean things like "discounts" and "promotions"] because of your agreement to have the charges for your Services, billed ('Joint Billing') by a wireline company affiliated with AT&T ('Affiliate') or because you subscribe to certain services provided by an Affiliate." Mittelstead Decl. Ex. 4 § 1.9. In other words, AT&T Mobility wireless customers may receive a discount if they also receive landline service from a company affiliated with AT&T.

It is clear from context that the particular use of the term "Affiliate" in Section 1.9 is limited to that section, and it is doubly clear that nothing in the arbitration provision suggests an intent to limit the ordinary meaning of "affiliates" in this way. In the arbitration provision, the word "affiliate" is not capitalized and separately defined as in Section 1.9. In addition, the term "affiliate" in the arbitration provision appears in the following list of corporate and other relationships between the covered parties and AT&T Mobility: "subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns." *Id.* Ex. 4 § 2.2(1). It is a black-letter interpretive principle that a "word takes meaning from the company it keeps." *Credit Suisse First Boston Mortg. Capital v. Danning, Gill, Diamond & Kollitz*, 178 Cal.App.4th 1290, 1298 n.6 (2009). Here, the list in the arbitration provision shows that the parties have agreed to broadly cover disputes with parties related to AT&T Mobility; it would be anomalous to read the term "affiliates" in that list to mean only wireline companies rather than give it its plain meaning as any company associated with AT&T Mobility "under common ownership or control."

Revitch next argues that AT&T's website and the arbitration provision's notice

procedures refer to AT&T rather than naming DIRECTV (Opp. 6-8), but that has nothing to do with the plain and controlling meaning of the term "affiliates." For example, the list of "AT&T's predecessors" on the website is not a list of other companies subject to the arbitration agreement; rather, the website says that "former customers" of AT&T Mobility or of its predecessors are "entitled" to use AT&T's "current arbitration provision" rather than the one they previously agreed to. Opp. 7. And the agreement's notice provisions are not "superfluous" (*id.*) in an arbitration against DIRECTV; if an AT&T Mobility customer elects to arbitrate a dispute with DIRECTV under the terms of his or her Wireless Customer Agreement and sends notice to the address listed in the agreement, DIRECTV will of course honor that notice (as it will every other term of the arbitration provision) without any need to offer "modifications" (*id.* at 8) to the terms of the agreement as written.

Indeed, while Revitch similarly speculates that DIRECTV would not be required to honor the consumer-friendly terms of his arbitration provision, "such as the payment of arbitration fees, a $10,000 minimum award, and doubling attorney's fees" (Opp. 8), the contract says otherwise. The terms in the arbitration agreement—including the provisions for cost-free arbitration and potential premium payments—describe the obligations of "AT&T" (Mot. 3-5; Mittelstead Decl. Ex. 4 § 2.2(3)-(6)), and the arbitration provision explains that "[r]eferences to 'AT&T'" include its "affiliates," like DIRECTV. Mittelstead Decl. Ex. 4 § 2.2(1). Accordingly, and contrary to Revitch's musings, the contract does "say who . . . is required to provide these benefits if a consumer pursues arbitration against DirecTV" under AT&T's arbitration provision (Opp. 8): DIRECTV is.

Next, Revitch's attempt to argue that the term "affiliates" is frozen in time as of the date of his signature in 2011 (Opp. 9) is wholly implausible in light of the broad, forward-looking language of the arbitration provision. The arbitration agreement covers not just AT&T Mobility's "affiliates," but also its "successors and assigns" (Mittelstead Decl. Ex. 4 § 2.2(1))— words that by definition refer to parties whose identities cannot be known until the future. And the arbitration agreement is forward-looking in other respects as well, covering "claims that may arise after the termination of this Agreement" and specifying that "[t]his arbitration provision

5
DIRECTV'S MOT. TO COMPEL ARBITRATION AND TO STAY LITIGATION;
CASE NO. 3:18-cv-01127-JCS

shall survive termination of this Agreement." *Id.* Revitch simply ignores the arbitration provision's express language referring to entities and disputes that cannot be known until the future .

Revitch also has no persuasive response to the decisions by the Ninth and Seventh Circuits cited in our opening brief, which held that that affiliated companies that were previously unrelated to the corporate party to an arbitration agreement at the time of contracting (but later became related) can compel arbitration when a dispute with the affiliate arose. *See* Mot. 7 (citing *Adams v. AT&T Mobility, LLC*, 524 F. App'x 322, 324 (9th Cir. 2013) (holding that AT&T Mobility "had a contractual right" to invoke the arbitration clause in plaintiff's wireless service contract as the "parent company" of "the successor" to the counterparty (Unicel) to plaintiff's contract); *Andermann v. Sprint Spectrum LP*, 785 F.3d 1157, 1158 (7th Cir. 2015) (holding that both the assignee of the plaintiff's contract with U.S. Cellular *and* the assignee's corporate affiliate were entitled to enforce the arbitration agreement contained in that contract)). Revitch points out that neither case "addressed the definition of 'affiliate'" (Opp. 16), but that definition is not in doubt. *See* pages 2-3, *supra*. Revitch further asserts that the cases "are distinguishable because the plaintiffs advanced interpretations that contradicted the plain language of the contracts." Opp. 16. But that is a ***similarity***, not a difference: Revitch is arguing against the "plain and ordinary meaning of 'affiliate'" as a company "associated with others under common ownership." *Satterfield*, 569 F.3d at 955.

Finally, Revitch protests that AT&T should have modified its arbitration provision to expressly name DIRECTV once DIRECTV became a subsidiary of AT&T Inc. Opp. 8-9. But he offers no support for his novel proposed requirement that contracts must name each corporate relative rather than using descriptors like "affiliates," "subsidiaries," "successors," and "assigns"—a requirement that stands in sharp contrast to cases like *Adams* and *Andermann* (and common sense). *Cf., e.g.*, *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 781 F. Supp. 2d 926, 942-43 (N.D. Cal. 2011) (explaining that under California law, a third party need not be named in a contract to qualify as a beneficiary; "[t]here are several ways to show that a third party is an intended beneficiary of a contract even if he is not specifically named," including by

showing that the contract "names a class of beneficiaries" to which the third party belongs). Simply put, the question is whether DIRECTV is entitled to enforce Revitch's actual arbitration agreement as an "affiliate" of AT&T Mobility—it is—not whether DIRECTV would also be entitled to enforce a hypothetical alternative arbitration agreement.

### B. Revitch's Claims Against DIRECTV Fall Within The Scope Of His Arbitration Agreement.

The substance of Revitch's TCPA claim fits comfortably within the broad scope of AT&T's arbitration provision. Remarkably, Revitch does not even acknowledge our showing that his claim fits within the arbitration provision's express coverage of "claims relating to advertising" (Mittelstead Decl. Ex. 4 § 2.2(1)); nor does he acknowledge our showing that the terms of AT&T's Wireless Customer Agreement will be central to the resolution of his TCPA claim because of Revitch's "consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you." *Id.* Ex. 4 § 1.10. He also does not discuss ***any*** of the cases we cited (at Mot. 9-10 & n.5) holding that a plaintiff's TCPA claims are subject to arbitration.

Instead, as anticipated in our opening brief, he relies on *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016) and a handful of other cases that he says are "similar" to this one. Opp. 11-12. *Wexler* is readily distinguishable, however. As Revitch concedes (Opp. 11), it was a wrong number case where the calls were never intended for the plaintiff, and therefore the calls were not "connected in some way to the service agreement" that the plaintiff had entered into with AT&T. *Wexler*, 211 F. Supp. 3d at 504. Revitch insists that this is a "distinction without a difference" and that this "fact had no bearing on the court's legal analysis" (Opp. 11-12), but that completely misunderstands the decision in *Wexler*. As the *Wexler* court made clear, it was specifically relying on these facts in concluding that "[a]s ***explained above***, Wexler's claims are not so connected [to the Wireless Customer Agreement]." 211 F. Supp. 3d at 504 (emphasis added).

Here, by contrast, Revitch's consent to be contacted in the AT&T Wireless Customer

Agreement "about our Services or other matters we believe may be of interest to you" shows that the contract contemplates that AT&T's customers will receive advertising calls for other services offered by AT&T and its affiliates and subsidiaries, like DIRECTV television service. *See* Mot. 9. Revitch does not deny that "prior express consent" is a defense to a TCPA claim (47 U.S.C. § 227(b)(1)(A)) or that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 56 (2d Cir. 2017). He also has no answer to the Seventh Circuit's holding that claims based on purportedly "unsolicited advertisements" by the assignee of a contract regarding the assignee's services can still have an "intimate relation" to the original contract. *Andermann*, 785 F.3d at 1158.[1] That conclusion is all the more apparent here, because the arbitration provision covers "claims relating to advertising" by AT&T Mobility *and* its "affiliates."[2]

Moreover, *Wexler* is wrongly decided. The court recognized that its refusal to enforce the arbitration agreement's plain language, if couched in terms of unconscionability, "would be in tension with *Concepcion*" because it "applies a general contract defense 'in a fashion that disfavors arbitration.'" *Wexler*, 211 F. Supp. 3d at 504-05 (distinguishing *In re Jiffy Lube Int'l,*

---

[1] Judge Posner's opinion in *Andermann* also makes clear that Revitch overreads Judge Posner's prior language in *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003) (cited at Opp. 12). Like Revitch here, the plaintiffs in *Andermann* argued that *Smith* stands for the proposition that it would be an "absurd result" to apply an arbitration provision to "statutory and tort claims" that do not seek to enforce the terms of the underlying contract. *Andermann*, 785 F.3d at 1159; *cf.* Opp. 12. The *Andermann* court criticized this interpretation as "untenable," explaining that:

> what we said, which differs totally from the Andermanns' characterization of what we said, is that "absurd results" would ensue if the arising-from and relating-to provisions contained in a payday loan agreement, defining what disputes would have to be arbitrated rather than litigated, were cut free from the loan and applied to a subsequent payday loan agreement that did not contain those provisions. That is not this case. The Andermanns' contract, containing the arising-out-of or relating-to provisions, is a single contract.

785 F.3d at 1159 (citation omitted).

[2] *Parm v. Bluestem Brands, Inc.*, 2017 WL 1193993 (D. Minn. Mar. 30, 2017), *appeal pending*, No. 17-1932 (8th Cir.) (cited at Opp. 12), is distinguishable for the same reasons. The district court in fact compelled arbitration of the claims that implicated the terms of the underlying contracts containing the arbitration provision. *See id.* at *12. As just discussed, Revitch's claim here satisfies that standard, and is not "wholly unrelated" to AT&T's Wireless Customer Agreement. *Id.* at *9.

*Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) (cited at Opp. 12), on that basis). The court in *Wexler* thought it could circumvent this issue by instead couching its holding in terms of contract formation—a "difference in rationale" that the court deemed "important" because of its view that such a holding did not implicate "the FAA's savings clause." *Id.* at 505. But the Supreme Court's subsequent decision in *Kindred Nursing Centers Limited Partnership v. Clark*, 137 S. Ct. 1421 (2017), made clear that the FAA's savings clause and "equal-footing principle" ***do*** apply to issues of contract formation: "A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the [FAA] than a rule selectively refusing to enforce those agreements once properly made." *Id.* at 1428; *see also id.* ("By its terms, then, the [FAA] cares not only about the enforcement of arbitration agreements, but also about their initial validity—that is, about what it takes to enter into them.") (quotation marks and alterations omitted); Mot. 10 n.6.[3]

Finally, Revitch protests that any ambiguities in the scope of the arbitration agreement should be resolved against DIRECTV. Opp. 16-18 (citing Cal. Civ. Code § 1654). While there is no need to reach that issue because Revitch's claim unambiguously is covered by his arbitration agreement, the analysis of the scope of the arbitration provision is governed by the Supreme Court's holding that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and that, "as a matter of ***federal law***, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand ***is the construction of the contract language itself*** or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,

---

[3] A federal court in West Virginia recently relied on *Wexler* in declining to compel arbitration of TCPA claims against DIRECTV similar to the one raised here. *See* Order, *Mey v. DIRECTV, LLC*, No. 17-cv-179, Dkt. No. 28 (Apr. 25, 2018), *appeal filed*, No. 18-01534 (4th Cir.). The court recognized that DIRECTV and AT&T Mobility "are affiliated"—contrary to Revitch's arguments here—but then block quoted several pages of the *Wexler* opinion and declared that it was "persuaded" by that opinion, with no discussion of the factual distinctions between the cases or of DIRECTV's arguments that *Wexler* rested on a legal premise that the Supreme Court has revealed to be incorrect. *See id.* at 11-14. Accordingly, DIRECTV has appealed the *Mey* decision to the Fourth Circuit and respectfully submits that this Court should decline to follow that decision's flawed reasoning.


460 U.S. 1, 24-25 (1983) (emphasis added); *accord Adams*, 524 F. App'x at 324 (applying this holding in concluding that AT&T Mobility could enforce arbitration agreement). This principle of the federal substantive law of arbitration, mandated by the FAA, "trumps" Revitch's resort to the state-law canon that ambiguities should be construed against the drafter. *Kristian v. Comcast Corp.*, 446 F.3d 25, 35 (1st Cir. 2006).[4]

In short, Revitch's TCPA claim is covered by his arbitration agreement and therefore should be compelled to arbitration.

### C. Revitch's Reliance On California's *McGill* Rule Is Misplaced.

Finally, Revitch tries to avoid the enforcement of his arbitration agreement by asserting that it may not be enforced under California's *McGill* rule, which conditions the enforceability of arbitration agreements on the availability of public injunctive relief. That bid fails, for at least two independent reasons.

*First*, on its own terms, *McGill* does not apply here. The California Supreme Court expressly limited its holding to "claims for public injunctive relief under the CLRA, the UCL, or the false advertising law." 393 P.3d at 90. And the Court in *McGill* further stated that class-wide injunctive relief of the type Revitch seeks here—relief on behalf of "a group of individuals similarly situated to the plaintiff"—"does *not* constitute public injunctive relief." *Id.* (emphasis added); *see also* Compl. ¶ 15 (seeking to represent a putative class of individuals who were allegedly called by DIRECTV or its agents); *id.* ¶ 23 (seeking "final injunctive relief" "with respect to the Class members"). And while the California Supreme Court's purported

---

[4] Revitch cites the California Supreme Court's contrary conclusion in *Sandquist v. Lebo Automotive, Inc.*, 376 P.3d 506, 514 (Cal. 2016), but this Court is not bound by a state court's interpretation of ***federal*** law. He also cites *Varela v. Lamps Plus, Inc.*, 701 F. App'x 670, 672 (9th Cir. 2017), which in turn relied on *Sandquist*, but he neglects to mention that the U.S. Supreme Court granted certiorari in that case a month before he filed his opposition. *See* 2018 WL 398496 (U.S. Apr. 30, 2018). In all events, while *Sandquist* (and therefore *Varela*) purported to find support for their position in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995), that reliance was misplaced. In *Mastrobuono*, both the federal policy in favor of arbitration and the state-law canon pointed to the same result. *See id.* at 62. Here, by contrast, the two would be "in tension" (if the arbitration agreement were actually ambiguous), and under those circumstances "the federal policy favoring arbitration" prevails. *Kristian*, 446 F.3d at 35.

distinctions between public injunctive relief and class-wide injunctive relief are wholly unpersuasive (*see* pages 11-12, *infra*), it is clear that those distinctions served as the foundation for the Court's conclusion that its rule escaped FAA preemption, as the Court attempted to distinguish *Concepcion* on the basis of those perceived distinctions. *McGill*, 393 P.3d at 97. It is telling, then, that Revitch cites no authority applying the *McGill* rule to claims for injunctive relief under the TCPA or any other statute than the ones identified by the California Supreme Court.[5]

*Second*, and in any event, California's *McGill* rule represents the State's latest attempt to condition the enforceability of arbitration provisions on the availability of class-like procedures, and it is therefore preempted by the FAA—just like the *Discover Bank* rule invalidated in *Concepcion*. Indeed, the *Concepcion* plaintiffs sought to avoid enforcement of AT&T's arbitration provision because they were pursuing a class action—and a public injunction—under the same California consumer-protection laws that were at issue in *McGill*. 563 U.S. at 337-38.[6] *McGill* also invoked the very same "public policy" of encouraging private plaintiffs to obtain relief benefiting "the general public" (393 P.3d at 94) that was advanced in *Concepcion* in defense of the *Discover Bank* rule.

But the Supreme Court made clear in *Concepcion* that California's interest in encouraging plaintiffs to seek class relief so that "small-dollar claims" don't "slip through the legal system" must yield to the FAA's overriding goal of "ensur[ing] the enforcement of arbitration agreements according to their terms." 563 U.S. at 344, 348-51. Moreover, public-injunction proceedings require consideration of class-wide evidence, which sacrifices the cost

---

[5] Both of the cases Revitch cites conclude that statutory **damages** claims under the TCPA are penal rather than remedial in nature. *Hannabury v. Hilton Grand Vacations Co.*, 174 F. Supp. 3d 768, 775 (W.D.N.Y. 2016); *US Fax Law Ctr., Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248, 1253 (D. Colo. 2005). We note that other courts have disagreed. *See, e.g.*, *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 779 (11th Cir. 2011). But, most relevant here, Revitch is not suggesting (nor could he) that his damages claims fall within the ambit of *McGill*.

[6] The district court's decision in that case confirms that the Concepcions were pursuing class-wide claims for "restitution" and "injunctive relief" under "California's Unfair Competition Law," "False Advertising Law," and "Consumer Legal Remedies Acts." *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255, at *1, 4, 17 (S.D. Cal. Aug. 11, 2008).

savings and expediency of individual arbitration and greatly "increases the risks to defendants." *Id.* at 348-50. If, as *Concepcion* holds, the FAA forbids states from conditioning enforcement of arbitration agreements on the availability of class procedures, it likewise forbids states from conditioning the enforceability of arbitration agreements on the availability of public-injunction proceedings.

Tellingly, Revitch does not mention *Epic*, which the Supreme Court decided eight days before he filed his opposition (and which was decided after all of the district court decisions on which he relies). The Court's decision makes all the more clear that *McGill* rests on a flawed foundation. The Supreme Court not only explained that the FAA "seems to protect pretty absolutely" the parties' "intention to use individualized rather than class or collective action procedures." 2018 WL 229244, at *6. It also then went on to reiterate that "the saving clause does not save defenses that target arbitration either by name or by more subtle methods, such as by 'interfering with fundamental attributes of arbitration.'" *Id*. (quoting *Concepcion*, 563 U.S. at 344) (brackets omitted).

That was fatal to the public-policy rule at issue in *Epic*, and it is equally fatal to the *McGill* rule. As the Court explained, the employees in *Epic* "object to their agreements precisely because they require individualized arbitration proceedings instead of class or collective ones. And by attacking (only) the individualized nature of the arbitration proceedings, the employees' argument seeks to interfere with one of arbitration's fundamental attributes." *Id*. at *7. The *McGill* rule, every bit as much as the rule in *Epic*, attacks only the individualized nature of the arbitration proceedings—by requiring that class-wide relief be available. Accordingly, it no more falls within the savings clause than did the rule in *Epic* (or the rule in *Concepcion*).

## CONCLUSION

The Court should enter an order (i) compelling plaintiff Jeremy Revitch to arbitrate his claims against DIRECTV in accordance with his arbitration agreement and (ii) staying this action pending the resolution of that arbitration.

Dated: June 8, 2018

Respectfully submitted,

**MAYER BROWN LLP**

 /s/ Anne M. Selin
Anne M. Selin (SBN 270634)
*aselin@mayerbrown.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone: (650) 331-2000

Archis A. Parasharami (*pro hac vice*)
*aparasharami@mayerbrown.com*
Daniel E. Jones (*pro hac vice* to be filed)
*djones@mayerbrown.com*
1999 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000

*Attorneys for Defendant DIRECTV, LLC*