UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY REVITCH, <br><br> Plaintiff, <br><br> v. <br><br> DIRECTV, LLC, <br><br> Defendant. | Case No. 18-cv-01127-JCS <br><br> **ORDER DENYING MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION AND SETTING FURTHER CASE MANAGEMENT CONFERENCE** <br><br> Re: Dkt. No. 23 |

## I.      INTRODUCTION

Plaintiff Jeremy Revitch brings a putative class action against Defendant DirecTV, LLC ("DirecTV") based on an automated call he received from DirecTV advertising its services. Revitch alleges that the call was made without his prior express written consent and therefore violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq.*  DirecTV brings a Motion to Compel Arbitration and to Stay Litigation ("Motion"), arguing that because Revitch is a wireless customer of AT&T Mobility LLC ("AT&T Mobility"), his claim is governed by the arbitration provision contained in his agreement with AT&T Mobility, which covers claims asserted against "affiliates" of AT&T.  According to DirecTV, it is an "affiliate" under the arbitration provision and therefore, Revitch's claims against it are subject to binding arbitration. A hearing on the Motion was held on Friday, July 20, 2018 at 9:30 a.m.  For the reasons stated below, the Motion is DENIED.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    The Complaint

Revitch alleges that DirecTV, "a direct broadcast satellite service provider and broadcaster," called his cellphone number on an unspecified date using a prerecorded voice to market its services. Complaint ¶¶ 1, 3.  According to Revitch, the recorded advertisement stated:

> This is an important announcement from DirecTV.  We are now offering our most popular viewing package for only $19.99 per month.  For a limited time, new customers also receive a free flat-screen television, just for signing up.  Press 1 to speak with a representative, or press 9 to be removed from future offers.

*Id.* ¶ 7.  Revitch states he never provided DirecTV with his telephone number or consented to receiving autodialed calls or prerecorded messages from DirecTV; nor had he ever had any contact with DirecTV prior to receiving this telephone call.  *Id.* ¶ 8.  Revitch alleges he was harmed by the prerecorded call "in the form of the aggravation, nuisance, trespass, waste of time and invasion of privacy[;] . . . depletion of battery life resulting from unwanted incoming calls; and violations of his statutory rights."  *Id.* ¶ 9.

Revitch alleges DirecTV has "a history of engaging in mass calling campaigns without call recipients' consent."  *Id.* ¶¶ 3, 11.  According to Revitch, the Federal Trade Commission ("FTC") has twice brought charges against, and fined, DirecTV for placing over 1 million telemarketing calls to potential and current customers on Do Not Call lists.  *Id.* ¶¶ 11–12.  Revitch maintains these unsolicited telemarketing calls have resulted in numerous online consumer complaints and thirteen lawsuits asserting TCPA violations.  *Id.* ¶¶ 10, 13.   Revitch alleges DirecTV has "determined that as long as violating the law is profitable, the occasional litigation and fines are an acceptable cost of doing business" and on that basis calls it a "scofflaw."  *Id.* ¶14.

Revitch asserts one claim in his complaint, under 47 U.S.C. § 227(b)(1)(A)(iii), which prohibits initiating any telephone call using an automatic telephone dialing system or an artificial or prerecorded voice without the prior express consent of the called party.  *Id.* ¶ 27.

### B.    Revitch's Relationship With AT&T Mobility

According to Ann Mittelstead, a paralegal with AT&T Services, Inc., Revitch has had an account with AT&T Mobility for wireless service since 2006.  Declaration of Ann Mittelstead in

Support of Defendant DirecTV, LLC's Motion to Compel Arbitration and to Stay Litigation ("Mittelstead Decl."), ¶¶ 3-4.  He upgraded his device on March 6, 2011 at an AT&T retail store, at which time he provided an electronic signature accepting the wireless agreement discussed below.  *Id.* ¶¶ 6-7.

### C.    The Wireless Agreement

The agreement between Revitch and AT&T Mobility containing the relevant arbitration provision consists of three documents: 1) the AT&T Mobility Wireless Customer Agreement ("Customer Agreement"); 2) a Customer Service Summary ("Customer Service Summary"); and 3) AT&T Mobility's record of Revitch's signature ("Signature Document").  *See* Mittelstead Decl., Exs. 2 - 4 (hereinafter, referred to collectively as "Wireless Agreement").

### 1.    The Customer Agreement

The Customer Agreement begins with a preamble ("Preamble") and is divided into ten sections setting forth the terms of service related to AT&T's wireless services.[2]  Mittelstead Decl., Ex. 4.  Below, the Court summarizes the sections that are relevant to the instant motion.

First, the Preamble provides that the terms "AT&T," "we," "us" or "our" "refer to AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T."  *Id.*, Preamble.  The Preamble goes on to state, in all capital letters, as follows:

> THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.

*Id.*

---

[2] The sections are numbered and titled as follows:
1.0 Term Commitment, Charges, Billing and Payment
2.0 How Do I Resolve Disputes with AT&T?
3.0 Terms Relating to Your Device and Content
4.0 Terms Relating to the Use and Limitations of Service
5.0 What Voice Services Does AT&T Offer?
6.0 What Data and Messaging Services Does AT&T Offer?
7.0 Are There Other Terms and Conditions that Apply to Features and Applications?
8.0 What are AT&T Roadside Assistance and Optional Wireless Phone Insurance?
9.0 What Other Terms and Conditions Apply to My Wireless Service?
10.0 What Terms Apply Only to Specific States?

United States District Court
Northern District of California

The arbitration provision is set forth in Section 2.0 of the Customer Agreement, entitled "HOW DO I RESOLVE DISPUTES WITH AT&T?" *Id.*, § 2.0. Section 2.1 is entitled "Dispute Resolution by Binding Arbitration" and states in bold at the beginning of the section, "PLEASE READ THIS CAREFULLY.  IT AFFECTS YOUR RIGHTS." *Id.*  Section 2.1 goes on to provide a "Summary" of the arbitration provision, and states, in part, as follows:

> Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department . . . **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court.  Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court and is subject to very limited review by courts.  Arbitrators can award the same damages and relief that a court can award.  **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.**

*Id.* (emphasis in original).

Section 2.2 is entitled, "Arbitration Agreement" and states, in relevant part, as follows:

> AT&T and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted.  It includes, but is not limited to:
>
> - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
> - claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
> - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
> - claims that may arise after the termination of this Agreement.
>
> References to "AT&T," "you" and "us" include our respective subsidiaries, *affiliates*, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

*Id.*, § 2.2(1) (emphasis added).

There is no separate "definition" section in the Customer Agreement and the term "affiliate" as used in Section 2.2 is not defined in the arbitration provision.  The word "affiliate" *is*

defined in Section 1.9, entitled "Are There Business or Government Benefits."  That section

states, in part, as follows:

> You may receive Benefits because of your agreement to have the charges for your Services, billed ("Joint Billing") by a wireline company affiliated with AT&T ("Affiliate") or because you subscribe to certain services provided by an Affiliate.  If you cancel Joint Billing or the Affiliate service, your rates will be adjusted without notice to a rate plan for which you qualify.

*Id.*, § 1.9.

Sections 2.2(2) through 2.2(4) set forth procedures for pursuing arbitration against AT&T,

including how to give notice to AT&T of an intent to arbitrate, the actions AT&T will take once it

receives notice, and procedures governing payment of any award or settlement by AT&T.  *Id.*, §§

2.2(3)–(4).  In addition, Section 2.2(3) provides that arbitration will be governed by the Consumer

Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes of the

American Arbitration Association ("AAA").  *Id.*, § 2.2(3); s*ee also* Declaration of Daniel Jones in

Support of Defendant DirecTV, LLC's Motion to Compel Arbitration and to Stay Litigation,

Docket No. 23-9 ("Jones Decl."), Ex. 1 ("AAA Rules").  Section 2.2(3) also states that customers

"may obtain information that is designed for nonlawyers about the arbitration process at

att.com/arbitration-information."  *Id.*

Section 2.2(6) allows arbitrators to award "declaratory or injunctive relief only in favor of

the individual party seeking relief and only to the extent necessary to provide relief warranted by

that party's individual claim."  *Id.*, § 2.2(6).  It further prohibits customers from bringing claims as

class members or in a representative capacity, stating:

> YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION.  Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claim, and may not preside over any form of a representative of class proceeding.

*Id.*  Section 2.2(6) further states, "If this specific provision is found to be unenforceable, then the

entirety of this arbitration provision shall be null and void."  *Id.*

Section 2.2(7) reserves AT&T Mobility's right to "make[] any future change to this

arbitration provision (other than a change to the Notice Address) during [the customer's] Service

United States District Court
Northern District of California

1    Commitment," and permits the customer to "reject any such change by sending [AT&T Mobility]

2    written notice within 30 days of the change." *Id.*, § 2.2(7).

3            The Customer Agreement also contains a provision that authorizes customer contacts,

4    stating, in part as follows:

5               You consent to the use by us or our authorized agents of regular
                mail, predictive or autodialing equipment, email, text messaging,
6               facsimile or other reasonable means to contact you to advise you
                about our Services or other matters we believe may be of interest to
7               you.

8    *Id.*, § 1.10.

9            Finally, the Customer Agreement contains a choice of law provision, providing that "[t]he

10   law of the state of your billing address shall govern this Agreement, except to the extent that such

11   law is preempted by or inconsistent with applicable federal law."  Declaration of Joel D. Smith in

12   Support of Opposition to DirecTV's Motion to Compel Arbitration ("Smith Decl."), Ex. 1

13   (Customer Agreement), § 9.3.2

14                        **2.   Customer Service Summary**

15           The first two pages of the Customer Service Summary set forth Revitch's billing

16   information, plan details, contact information for AT&T and AT&T's cancellation, return and

17   warranty policies.  Mittelstead Decl., Ex. 2 at 1–2.  The third page, headed "Wireless Service

18   Agreement," lists Revitch's wireless number and (redacted) account number at the top page, and

19   contains a provision stating, "Your agreement with AT&T consists of: (1) The Wireless Customer

20   Agreement #FMSTCT01110180E **and its arbitration clause**, and (2) the rates and other details

21   about the rate plan in the Customer Service Summary."  *Id.* at 3 (emphasis in original).  Below this

22   is a statement, in bold, stating: "I have reviewed and agree to the rates, terms, and conditions for

23   the wireless products and services described in the Wireless Customer Agreement (including

24   limitation of liability and arbitration provisions) and the Customer Service Summary."  *Id.*  This

25   statement is followed by a small box stating, "You will sign this agreement electronically . . . If

26   electronic signature is not available, please sign below."  *Id.*  The signature line is blank.  *Id.*

27                        **3.   Signature Document**

28           The Signature Document, dated March 06, 2011, lists Revitch's telephone number and

United States District Court
Northern District of California

6

includes the following statement: "I have reviewed and agree to the rates, terms, and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and arbitration provision) and the Customer Service Summary, both of which were made available to me prior to my signing." Mittelstead Decl., Ex. 3.  The statement is followed by Revitch's signature.  *Id.*  According to AT&T Special Operations Manager Don Ketmayura, Revitch would have seen the statement quoted above, and the entire Customer Agreement, displayed on an electronic signature-capture device during his transaction with AT&T Mobility.  Declaration of Don Ketmayura in Support of Defendant DirecTV, LLC's Motion to Compel Arbitration and to Stay Litigation ("Ketmayura Decl."),  ¶¶ 5–6 & Exs. 1–2.  Revitch had the option to read the Customer Agreement on the device or print the entire document by pressing an on-screen button.  *Id.*   Upon pressing an on-screen button labeled "accept," Revitch would have been able to sign the document.  *Id.*

### D.     Relationship between DirecTV and AT&T Mobility

DirecTV is an indirect, wholly-owned subsidiary of AT&T Inc.  Mittelstead Decl. ¶¶ 9–12. AT&T Mobility is owned by three entities: SBC Long Distance, LLC, SBC Tower Holdings LLC, and BellSouth Mobile Data, Inc.;  these three entities, in turn, are all subsidiaries of AT&T Inc. Mittelstead Decl. ¶¶13–14.   According to Plaintiff, DirecTV became an indirect subsidiary of AT&T Inc. in 2015.  Opposition at 2.  AT&T Mobility, LLC has been indirectly owned by AT&T Inc. since 2006.  Motion at 1.

Plaintiff contends AT&T Inc. is "purely a holding company" without control over any AT&T entity, citing a brief filed by AT&T Inc. in a New Jersey case in which it disputed the existence of personal jurisdiction based, in part, on the fact that it was only a holding company. Smith Decl., Ex. 7.  According to AT&T Inc.'s December 31, 2017 Form 10-k filing with the Securities and Exchange Commission, as of that date AT&T Inc. owned at least twenty-seven "principal subsidiaries" in the Western Hemisphere.  *Id.*, Ex. 6.

### E.     Contentions of the Parties

In the Motion, DirecTV contends it is an "affiliate" under Section 2.2(1) of the Customer Agreement.  DirecTV further asserts that the claims in this case are within the scope of the

United States District Court
Northern District of California

arbitration provision because Section 2.2(1) expressly references "claims relating to advertising," claims "relating to any aspect of the relationship between us," and claims "based in statue," all of which apply to Plaintiff's claim in this action. Therefore, DirecTV asserts that it is entitled to invoke the arbitration clause to compel Revitch to arbitrate the TCPA claim that he asserts against it.

In his Opposition brief, Revitch counters that DirecTV is *not* an "affiliate" within the meaning of the arbitration provision, and more broadly, that he never intended to enter into an arbitration agreement with DirecTV, and therefore, that DirecTV cannot enforce the arbitration provision against him. Revitch does not address DirecTV's contention that his claim falls within the scope of the agreement because it is related to advertising. Revitch further asserts that the arbitration provision is invalid under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), in which the California Supreme Court held that an arbitration provision that purported to waive the right to seek public injunctive relief was invalid under California Civil Code section 3513.

DirecTV argues in its Reply brief that *McGill* does not apply in this case because the class-wide injunctive relief the TCPA provides is not a public injunction within the meaning of *McGill*. It further asserts that the defense Revitch seeks to assert under *McGill* is preempted by the FAA.

## III. ANALYSIS

### A. Legal Standards

#### 1. General Legal Standards Governing the FAA

Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Because arbitration is a matter of contract, the question of arbitrability is, in principle, an issue for judicial determination. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). The court's role in addressing a question of arbitrability is "limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court finds that both of these

United States District Court
Northern District of California

1  requirements are met, the FAA requires it to enforce the provision in accordance with its terms.

2  *Id.*

3       The FAA "was created to counter prevalent judicial refusal to enforce arbitration

4  agreements . . . and has been interpreted to embody 'a liberal federal policy favoring arbitration.'"

5  *Mortenson v. Bresnan Communications*, LLC, 722 F.3d 1151, 1157 (9th Cir. 2013) (quoting

6  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and citing *AT&T*

7  *Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).  Thus, the Supreme Court has held that

8  "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration,

9  whether the problem at hand is the construction of the contract language itself or an allegation of

10  waiver, delay, or a like defense to arbitrability."  *Moses H. Cone*, 460 U.S. at 24–25.  Nonetheless,

11  "[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only*

12  *those disputes*—that the parties have agreed to submit to arbitration."  *Granite Rock Co. v. Int'l*

13  *Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original) (internal quotation marks

14  omitted).  Consequently, courts may apply the "presumption favoring arbitration . . . only where it

15  reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular

16  dispute is what the parties intended because their express agreement to arbitrate was validly

17  formed and . . . is legally enforceable and best construed to encompass the dispute."  *Id.* at 303.

18  Even where such a presumption arises, the Court explained, arbitration should be ordered only if

19  the presumption is not rebutted.  *Id.* at 301.  Where the presumption applies, courts "compel

20  arbitration 'unless it may be said with positive assurance that the arbitration clause is not

21  susceptible of an interpretation that covers the asserted dispute.'"  *Goldman, Sachs & Co. v. City of*

22  *Reno*, 747 F.3d 733, 746 (9th Cir. 2014)(9th Cir. 2014) (quoting *AT & T Techs., Inc. v. Comm'ns*

23  *Workers of Am.*, 475 U.S. 643, 650 (1986)(internal quotation marks and citation omitted)).

24       The Supreme Court in *Granite Rock* explained that the presumption in favor of arbitration

25  "is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's

26  longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the

27  same footing as other contracts.'"  561 U.S. at 299 (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees*

28  *of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).  The Supreme Court continued, "we

United States District Court
Northern District of California

9

have never held that this policy overrides the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.' Nor [has the Court] held that courts may use policy considerations as a substitute for party agreement." *Id*. (citations omitted) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

As a general rule, courts apply state contract law in determining the validity and scope of an arbitration agreement. *Wolsey, Ltd. v. Foodmaker, Inc*., 144 F.3d 1205, 1210 (9th Cir. 1998). Thus, in determining whether there is a valid agreement to arbitrate, "courts must 'apply ordinary state-law principles that govern the formation of contracts.'" *Id*. (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, it is undisputed that California state law governs the interpretation of the Wireless Agreement (unless it is preempted by the FAA) because the Wireless Agreement contains a choice-of-law provision that looks to the customer's billing address, which in this case is California. Therefore, the Court looks to California law in addressing whether a valid agreement to arbitrate exists between Plaintiff and DirecTV and (assuming it does) whether Plaintiff's claim falls within the scope of that agreement.

## 2.  **FAA Preemption and *Concepcion***

The final phrase of § 2 of the FAA is a saving clause, permitting "arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). In *Concepcion*, the Supreme Court held that "[t]his saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id*. (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Nonetheless, even state law defenses that are generally applicable are preempted if they "stand as an obstacle to the accomplishment of the FAA's objectives." *Id*. at 343.

In *Concepcion*, the Court addressed whether the FAA preempted a defense to arbitration based on a rule adopted in *Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005). In *Discover Bank*, the California Supreme Court held that a class action waiver is unconscionable when it "is found in a consumer contract of adhesion in a setting in which disputes between the contracting

parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money."  36 Cal. 4th at 162-163.  Under those circumstances, the court found, the waiver is unenforceable, "at least to the extent the obligation at issue is governed by California law, [because it] becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.'" *Id*. (quoting Cal. Civ. Code § 1668).  The Supreme Court, however, concluded that the *Discover Bank* rule was preempted, even though it was based on a contract defense that is "thought to be generally applicable" (unconscionability) because it "interfere[d] with fundamental attributes of arbitration and thus create[d] a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 341.

**B.     Whether There is A Valid Agreement to Arbitrate Between Plaintiff and DirecTV**

The first requirement of the FAA's two-prong test – whether there is a valid agreement to arbitrate between Revitch and DirecTV – requires the Court to address two questions.  First, did the parties intend to enter into an agreement to arbitrate the claim asserted in this case, as is required under California state law governing contract formation.  Second, assuming that the parties intended to enter into an agreement to arbitrate, is the agreement rendered invalid under the California Supreme Court's decision in *McGill* because the agreement prohibits class actions.  Because the Court concludes the parties did not enter into an agreement to arbitrate Revitch's claim it does not reach the second question.

**1.  Background**

DirecTV contends Revitch entered into an agreement to arbitrate his claim against it because the arbitration provision in the Customer Agreement covers "affiliates" and under the generally accepted definition of that term, DirecTV is an "affiliate" of AT&T Mobility.  *See* Motion at 6-7 (citing Customer Agreement § 2.2(1); Black's Law Dictionary (10th ed. 2014) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation"); Cal. Corp. Code § 150 (providing that "[a] corporation is an 'affiliate' of, or a corporation is 'affiliated' with, another

specified corporation if it directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation"); *Cacique, Inc. v. Reynaldo's Mexican Food Co.*, LLC, No. 2:13-CV-1018-ODW MLG, 2014 WL 505178, at *5-6 (C.D. Cal. Feb. 7, 2014)).  According to DirecTV, other courts also have concluded that arbitration clauses containing similarly broad language describing the parties covered by the agreement could be enforced by related corporate entities.  *Id.* at 7 (citing *Adams v. AT&T Mobility, LLC*,  816 F.Supp.2d 1077, 1080 (W.D. Wash. 2011), *aff'd* 524 F. App'x. 322 (9th Cir. 2013); *Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157  (7th Cir. 2015)).  DirecTV further asserts that to the extent there is "uncertainty as to whether Revitch's claims are arbitrable . . . the Supreme Court has instructed that 'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Id.* at 10-11 (quoting *Moses H. Cone*, 460 U.S. at 24-25).

Revitch rejects DirecTV's argument that it is an "affiliate" under the Wireless Agreement, arguing that the terms of the Wireless Agreement and the conduct of AT&T Mobility support the opposite conclusion.  Opposition at 5-9.  With respect to the terms of the Wireless Agreement, Revitch points to Section 1.9 of the Customer Agreement, which contains a definition of "affiliate" that is limited to providers of landline telephone service (whereas DirecTV provides satellite television services).  *Id.* at 5-6.  He also points to the website link referenced in Section 2.2(3), provided to explain the arbitration provision to "non-lawyers."  *Id.* at 6.  According to Revitch, the link takes consumers to a page that lists specific entities that are subject to the arbitration agreement, stating:

> You can find a copy of our arbitration provision at att.com/dispute resolution. This document provides additional information on dispute resolution. Former AT&T customers as well as former customers of AT&T's predecessors **(Cingular Wireless, the former AT&T Wireless, BellSouth Mobility, Ameritech Mobile, Pacific Bell Wireless, SBMS, SNET Mobility, and SBC Wireless)** are entitled to have any dispute resolved under AT&T's current arbitration provision.

*Id.* at 7 (quoting Smith Decl., Ex. 2 (print-out of webpage)) (emphasis added in Revitch's brief).

Revitch points out that there is no mention of DirecTV on this page.  *Id.*

Revitch also points to the procedures for pursuing arbitration described in the arbitration provision, contending that they are "not set up to process arbitration claims against DirecTV." *Id.* For example, Section 2.2(3) instructs consumers to send notice of their intent to arbitrate to AT&T's Office for Dispute Resolution in Atlanta, Georgia and *not* to DirecTV's headquarters in El Segundo, California. *Id.* at 7-8. Revitch argues that if the arbitration provision was intended to cover DirecTV, it would have included either a requirement that notice be sent directly to DirecTV or that AT&T Mobility forward the notice to DirecTV, but it contains neither. *Id.* at 8. Similarly, he asserts, the provisions that AT&T Mobility touts as "consumer-friendly," such as payment of arbitration fees, minimum awards and doubling of attorneys' fees, "[do] not say who – if anyone – is required to provide these benefits if a consumer pursues arbitration against DirecTV based on claims that have nothing to do with the [Wireless Agreement.]" *Id.* (citing Smith Decl., Ex. 1 (Customer Agreement), §§ 2.2(3)-(4)). Finally, Revitch contends AT&T Mobility's failure to revise the terms of the arbitration provision when it acquired DirecTV in 2015 to reflect that the provision covered DirecTV – even though it was entitled to change any terms of Revitch's service (Section 1.3) and to make "future changes" to the arbitration provision (Section 2.7) – shows that AT&T Mobility did not intend to have the arbitration provision cover claims against DirecTV. *Id.* at 8-9.

Revitch also argues more generally that he could not have reasonably intended at the time of contracting that his claims against DirecTV would be covered by the arbitration provision. *Id.* at 9-12. First, he points out that he entered into the agreement in 2011, more than four years before AT&T Inc. acquired DirecTV, arguing that the arbitration provision "does not say that claims against unspecified companies that might become subsidiaries of AT&T Inc. years in the future are subject to arbitration, even if the claims have nothing to do with [the Wireless Agreement]." *Id.* at 9 (citing *Levi Strauss & Co. v. Aetna Casualty and Surety Co.*, 184 Cal. App. 3d 1479, 1486 (1986)).

Second, Revitch contends DirecTV's position is "contrary to the rule that contracts must be construed in a manner that is 'fair and reasonable' and will not lead to absurd results." *Id.* (quoting *Kashmiri v. Regents of Univ. of California*, 156 Cal. App. 4th 809, 842 (2007), as

modified (Nov. 15, 2007), as modified (Nov. 28, 2007)).  In particular, he argues that he could not have intended to enter into an agreement where simply by engaging in the "mundane act of buying a wireless service from AT&T Mobility" he "sign[ed] away [his] rights to sue for anything—even wrongful death claims— against an ever-changing host of unnamed companies, foreign and domestic, that might fall under AT&T Inc.'s vast corporate umbrella, either now or in the future." *Id*. at 10.  To highlight the unreasonableness of DirecTV's position, Revitch points to the "convoluted relationship" between AT&T Mobility and DirecTV, which he depicts in graphical form in his brief.  *Id*.

Revitch relies on *Wexler v. AT&T Corp*., 211 F. Supp. 3d 500 (E.D.N.Y. 2016) in support of his position, noting that in that case the court rejected a similar argument based on the same arbitration provision, finding that the broad reading of the provision "failed under general principals of contract formation."  *Id*. at 11.  According to Revitch, other courts have reached similar conclusions under similar circumstances.  *Id*. at 12 (citing *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012); *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003); *Parm v. Bluestem Brands, Inc*., 2017 WL 1193993, at *9 (D. Minn. Mar. 30, 2017)).

Revitch also argues that DirecTV places excessive weight on dictionary definitions and the definition of "affiliate" in the California Corporations Code §150, as it is the intent of the parties as expressed in the underlying agreement that matters.  *Id*. at 13-14 (citing *Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 9 (2017);  *Flintkote Co. v. Gen. Acc. Assur. Co*., 410 F. Supp. 2d 875, 887 (N.D. Cal. 2006)).  Moreover, Revitch asserts, even the definitions cited by DirecTV do not support its position as they require some element of control on the part of the parent company that links the entities.  *Id*. at 15 (citing *Cacique, Inc. v. Reynaldo's Mexican Food Co*., LLC, No. 2:13-CV-1018-ODW MLG, 2014 WL 505178, at *5 (C.D. Cal. Feb. 7, 2014)).  Revitch asserts that AT&T Inc. is merely a holding company, however, and exercises no control over either AT&T Mobility or DirecTV.  *Id*. (citing Smith Decl., Ex. 7 (AT&T Reply brief in *Horowitz v. AT&T Inc*., p. 6 (arguing that there was no personal jurisdiction over AT&T Inc. in New Jersey based in part on the fact that there was "no evidence of AT&T Inc.'s control over any AT&T entity"))).

14

United States District Court
Northern District of California

1    Finally, Revitch rejects DirecTV's argument that any ambiguity must be resolved in favor

2    of arbitration, arguing that the general principal under California law that ambiguities are

3    construed against the drafter applies instead.  *Id*. at 17 (citing Cal. Civ. Code § 1654).  According

4    to Revitch, this rule is applied to all contracts, without putting arbitration agreements on different

5    footing from other contracts, and therefore is not preempted by the FAA's presumption in favor of

6    arbitration.  *Id*. at 18.

### 2.  California Law Governing Contract Interpretation

8    California Civil Code section 1636 provides that "[a] contract must be so interpreted as to

9    give effect to the mutual intention of the parties as it existed at the time of contracting, so far as

10   the same is ascertainable and lawful."  Cal. Civil. Code § 1636.  "Although the intent of the parties

11   determines the meaning of the contract, the relevant intent is the objective intent as evidenced by

12   the words used by the parties and not either party's subjective intent."  *Kashmiri*, 156 Cal.App.4th

13   at 838.  "Where contract language is clear and explicit and does not lead to absurd results, we

14   normally determine intent from the written terms alone."  *Id.* at 831 (citing Cal. Civ. Code §§

15   1638–39).  In interpreting the written terms, courts read the contract as a whole and construe its

16   terms in a manner that is reasonable and fair.  *California Nat'l Bank v. Woodbridge Plaza LLC*,

17   164 Cal. App. 4th 137, 143 (2008).   Courts read terms as understood in their ordinary and

18   popular sense.  Cal. Civ. Code § 1644.

19   A contract is ambiguous when "it is capable of two or more constructions, both of which

20   are reasonable."  *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co*., 9 Cal. 4th 27, 37 (1994),

21   as modified (Mar. 2, 1995).   If terms are ambiguous or uncertain, the court should rely on "the

22   reasonable expectation of the parties at the time of the contract."  *Kashmiri*, 156 Cal.App.4th at

23   832; *accord* Cal. Civ. Code § 1636.   The parties' reasonable expectation is determined by "the

24   totality of the circumstances . . . shown by the acts and conduct of the parties, interpreted in the

25   light of the subject matter and of the surrounding circumstances."  *Foley v. Interactive Data Corp.*,

26   47 Cal. 3d 654, 681 (1988); *accord* Cal Civ. Code §1647.  Where there is doubt as to the intent of

27   the parties, ambiguities in written agreements are to be construed against the drafters, a rule that

28   "applies with particular force in the case of a contract of adhesion."  *Sandquist v. Lebo*

15

1   *Automotive, Inc.*, 1 Cal. 5th 233, 247 (2016) (citing Cal. Cive Code § 1654; Rest. 2d. Contracts, §

2   206).

3   ### 3.  Discussion

4          The Court looks to the language of the Wireless Agreement and the surrounding

5   circumstances to determine whether there is an agreement to arbitrate Revitch's claim against

6   DirecTV.  The Court concludes that although the term "affiliate" as commonly understood and as

7   used in the Wireless Agreement includes sibling corporations, it was not the parties' intent to enter

8   into an arbitration agreement that would cover claims against an entity  (like DirecTV) that

9   became affiliated with AT&T Mobility years after Plaintiff entered into the contract with AT&T

10   Mobility as the result of an acquisition by AT&T Mobility's parent company and not due to an

11   assignment of any obligations in the original contract.   Therefore, the Court concludes there is no

12   agreement to arbitrate Plaintiff's claim against DirecTV, which is not subject to arbitration.

13          The arbitration provision in the Customer Agreement defines "AT&T" and "us" broadly to

14   include AT&T Mobility's "respective subsidiaries, affiliates, agents, employees, predecessors in

15   interest, successors and assigns."  Mittelstead Decl., Ex. 4 (Customer Agreement), § 2.2(1).  The

16   term "affiliate" is generally understood to include sibling corporations.  *See* Black's Law

17   Dictionary (10th ed. 2014) (defining "affiliate" as "[a] corporation that is related to another

18   corporation by shareholdings or other means of control; a subsidiary, parent or *sibling*

19   corporation") (emphasis added); Cal. Corp. Code § 150 (providing that "[a] corporation is an

20   'affiliate' of, or a corporation is 'affiliated' with, another specified corporation if it directly, or

21   indirectly through one or more intermediaries, controls, is controlled by or is under common

22   control with the other specified corporation");  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946,

23   955 (9th Cir. 2009) ("The plain and ordinary meaning of 'affiliate' supports this definition as 'a

24   company effectively controlled by another or associated with others under common ownership or

25   control.'").  Therefore, the Court concludes that the term "affiliate," as a general matter, was

26   intended to include sibling entities, that is, entities owned (directly or indirectly) by the same

27   holding company.

28          The Court is not persuaded by Revitch's reliance on Section 1.9 in support of his assertion

16

that the word "affiliate" in the arbitration provision does not include sibling corporations.  Section 1.9 includes a definition of "affiliate" that appears to refer to companies that provide landline services.  In particular, it states in part, "You may receive Benefits because of your agreement to have the charges for your Services, billed  . . . **by a wireline company affiliated with AT&T ("Affiliate")** or because you subscribe to certain services provided by an Affiliate."  Mittelstead Decl., Ex. 4 (Customer Agreement), § 1.9 (emphasis added).  The word "wireline," in turn, is used in the Customer Agreement to refer to telephone companies that provide landline services.  *See id.*, at § 1.5 (". . . if you elect to receive your bills for your Services combined with your wireline phone bill . . . "); § 4.6.1.5 ("Calls to wireless numbers . . . may cost more than calls to wireline numbers.  If a customer calls an overseas wireline number and the call is forwarded to a wireless number, the customer will be charged for a call terminated to a wireless number"); § 5.9 ("Nation Plan and Individual Subscribers can place/receive calls to/from up to 5 . . . wireline or wireless telephone numbers without being charged for airtime minutes."); § 5.11.2 ("AT&T Unity Calling Minutes may be used when directly dialing or receiving calls from any other eligible AT&T wireline or wireless phone number from within your calling area").   However, the subsequent uses of "affiliate" in Section 1.9 are capitalized, whereas the word is not capitalized in the arbitration provision that follows.  Moreover, subsequent uses "affiliate" or "affiliated" in the Customer Agreement do not appear to be limited to providers of landline telephone service.   For example, Section 6.4, entitled "How Does AT&T Calculate My Data Usage/Billing?" refers to "affiliated partner *wireless* networks."  *Id.*, § 6.4.

Nor is the Court persuaded by Revitch's reliance on the procedures described in the arbitration provision in support of the conclusion that DirecTV was not intended to be an "affiliate."  *See id.*, §§ 2.2(2)-(4).  While these procedures reference only "AT&T," the arbitration provision makes clear that references to AT&T "include [its] . . . affiliates."  *Id.* § 2.2(1).  For the same reason, the benefits to which a consumer is entitled under the arbitration provision do not differ when an affiliate is involved simply because the provisions that describe these benefits refer only to "AT&T."   The webpage provided to explain the arbitration for "laypersons" also does not support Revitch's position.  In particular, the list of predecessors of AT&T Mobility that Revitch

17

cites does not purport to describe the entities that may invoke the arbitration provision but rather, explains which former customers may rely on the "current arbitration provision." *See* Smith Decl., Ex. 2 (webpage stating that "Former AT&T customers as well as former customers of AT&T's predecessors (Cingular Wireless, the former AT&T Wireless, BellSouth Mobility, Ameritech Mobile, Pacific Bell Wireless, SBMS, SNET Mobility, and SBC Wireless) are entitled to have any dispute resolved under AT&T's current arbitration provision").

The Court also rejects Revitch's argument that there must be some element of control on the part of the common owner of AT&T Mobility and DirecTV to make these entities "affiliates." Revitch cites *Cacique, Inc. v. Reynaldo's Mexican Food Co., LLC*, in support of this position. In that case, the court addressed the meaning of the term "affiliated entities" in a settlement agreement that did not define the term. No. 2:13-CV-1018-ODW MLG, 2014 WL 505178, at *5 (C.D. Cal. Feb. 7, 2014). The court noted that many definitions of "affiliate" "include some element of control." *Id*. at *5 (citing Cal. Corp. Code § 150 and Black's Law Dictionary (9th ed. 2009)). It went on to find that a prior contract between the parties "bolster[ed] the control element" in these definitions because it defined "affiliate" as "any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member, Manager or other party being referenced." *Id*. The prior agreement went on to provide a definition of the term "control." *Id.* Thus, to the extent the court found that an "affiliate" required some element of control, that holding was based upon the specific facts of the case. The court in *Cacique* simply did not address whether the generally accepted meaning of "affiliate" includes entities under common *ownership* by a holding company. As discussed above, many definitions include such sibling entities and nothing in the language of the arbitration provision points to a different interpretation of the term.

The Court's conclusion that a sibling company may be an "affiliate" under the arbitration provision does not end the inquiry, however, because the question remains whether Revitch intended to enter an agreement to arbitrate with an entity that became affiliated with AT&T Mobility long after he entered into the original contract by virtue of an entirely fortuitous event,

18

namely, the acquisition of DirecTV by a holding company that also owns AT&T Mobility. Applying general state law principles governing contract formation, the Court concludes that he did not.

As a preliminary matter, the Court rejects DirecTV's argument that "forward looking" language in the arbitration provision shows that the parties intended that it would cover future affiliates, regardless of when or how an entity became an affiliate. DirecTV relies on the fact that the arbitration provision states that "[r]eferences to 'AT&T,' 'you' and 'us' include . . . "successors [ ] and assigns" but it is undisputed that DirecTV is neither a "successor" nor an "assign" of AT&T Mobility. *See* Mittelstead Decl., Ex. 4 (Customer Agreement), § 2.2(1). DirecTV reasons that the reference to "successors and assigns" shows that the arbitration provision was intended to cover claims against entities "whose identities [could not] be known until the future," but nothing in this language suggests that it was intended to cover *any* entity whose identity was unknown at the time of contracting.

Nor do *Adams* or *Andermann* stand for a contrary result. In *Adams v. AT&T Mobility, LLC*, the plaintiff (Severance) brought claims against AT&T Mobility for allegedly violating the Federal Communications Act's ban on automated messages. 816 F.Supp.2d at 1080. Adams had entered into a contract for cellular telephone service with Unicel, Inc. ("Unicel"), but her service agreement was subsequently acquired by New Cingular Wireless PCS, LLC ("New Cingular"), which was at all relevant times a subsidiary of AT&T Mobility. *Id.* After New Cingular acquired her service contract, AT&T Mobility sent text messages to Severance attempting to sell her new cellular services. *Id.* AT&T Mobility sought to compel arbitration based on the arbitration provision in the Unicel agreement, which stated:

> We (including our assignees, agents, employees, officers, directors, shareholders, parent companies, subsidiaries, affiliates, predecessors and successors) or you may elect to have any claim, dispute, or controversy ("Claim") of any kind (whether in contract, tort or otherwise) arising out of or relating to your Service or this agreement . . . or any prior or future dealings between you and us resolved by binding arbitration.

*Id.* at 1083. Severance argued that she did not agree to arbitrate her claims against AT&T Mobility because AT&T Mobility was not an assignee of, successor to or parent of Unicel. *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

1084.  The district court rejected this argument, however, reasoning that when New Cingular acquired the service agreement, it replaced Unicel as the contracting party and therefore, the first sentence quoted above effectively read: "We, meaning New Cingular (including our assignees, agents, . . . parent companies)."  *Id.*  Because AT&T Mobility was a parent company, the court concluded that it was covered under the arbitration clause.  *Id.*

In contrast to the facts of *Adams*, the sibling relationship that now exists between AT&T Mobility and DirecTV is not the result of any assignment of the Wireless Agreement by AT&T Mobility to some previously unknown entity.  Nor has any new entity stepped into the shoes of AT&T Mobility as a successor. Instead, the relationship that now exists between AT&T Mobility and DirecTV resulted from the completely fortuitous fact that a holding company that indirectly owns AT&T Mobility acquired DirecTV.   *Adams* is not on point.

Similarly, the Court does not find DirecTV's reliance upon *Andermann* to be persuasive. In that case, the Andermanns brought a TCPA claim against Sprint Spectrum L.P. ("Sprint Spectrum") based on the receipt of allegedly unsolicited calls advertising its services.  785 F.3d at 1158.  The Andermanns had previously obtained their phone service through U.S. Cellular, signing a service contract that included an arbitration clause.  *Id.*   The arbitration clause provided that "any controversy or claim arising out of or relating to this agreement [i.e., the contract for mobile phone service] shall be resolved by binding arbitration" and that "this arbitration agreement survives the termination of this service agreement."  *Id.*  The contract also allowed U.S. Cellular to assign the service contract without notice to the customer.  *Id.* The contract was subsequently assigned to Sprint Solutions, Inc. ("Sprint Solutions"), which became the new provider of the Andermann's phone service.  *Id.*   Sprint Solutions was Sprint Spectrum's holding agent for the contracts assigned by U.S. Cellular.  *Id.*  The Andermanns argued that "because Sprint Spectrum, though an affiliate of Sprint Solutions, [was] not the assignee [of the U.S. Cellular agreement] it [couldn't] require them to arbitrate their dispute with it."  *Id.* at 1159.   The court disagreed however.

The *Andermann* court reasoned that the original service contract expressly permitted assignment and the Sprint entities were assignees.  *Id.*  Even though the service agreement was

1   technically assigned to Sprint Solutions, the court found that it covered Sprint Spectrum as well

2   because Sprint Solutions was acting as an agent for Sprint Spectrum in holding the contracts

3   assigned by U.S. Cellular.  *Id*.  The court found further that the advertising calls upon which the

4   plaintiff's claims were based bore an "intimate relation" to the service agreement, explaining:

> The contract authorized an assignment, and because of the incompatibility of the assignor's (U.S. Cellular's) cellphones and the assignee's (Sprint's) mobile phone network, Sprint had had to terminate the U.S. Cellular customers, such as the Andermanns, whom it had acquired by virtue of the assignment; for they could not use their cellphones without switching to a different network. It was to prevent the loss of all these customers because of the incompatibility that Sprint had told them in the calls that it could offer them a substitute service.

10   *Id*. at 1158-1159.

11       Again, the facts here are entirely distinguishable.  As discussed above, there has been no

12   assignment of Revitch's Wireless Agreement.  Nor do the advertising calls placed by DirecTV

13   relate in any way to Revitch's wireless service.  Thus, the fact that the court in *Andermann*

14   enforced the arbitration provision in that case with respect to claims asserted against Sprint

15   Spectrum does not support the conclusion that DirecTV is entitled to invoke the arbitration

16   provision here.  The Court concludes that *Adams* and *Andermann*, at most, support the conclusion

17   that an entity may become an affiliate subject to the arbitration contract after the time of

18   contracting where that relationship arises from an assignment of the underlying agreement or a

19   related entity becomes a successor to the original contracting entity.  That is not the case here.

20       The Court also rejects DirecTV's reliance on that fact that the arbitration provision covers

21   "claims that may arise after the termination of this Agreement."  *See* Mittlestead Decl., Ex. 4

22   (Customer Agreement), § 2.2(1).  While this language is, indeed, "forward looking," it governs

23   only the types of claims that must be arbitrated, not the entities that may invoke the arbitration

24   clause.   Therefore, the Court rejects DirecTV's argument that the terms of the Wireless

25   Agreement show that the arbitration provision covers claims asserted against a future affiliate.

26       Having found that the arbitration provision in the Customer Agreement does not expressly

27   authorize a future affiliate to compel arbitration, the Court turns to general state law principles of

28   contract formation to determine the parties' intent.  The undersigned, like the court in *Wexler*,

United States District Court
Northern District of California

1    concludes that under the state law rule requiring that contracts must be interpreted so as to avoid

2    absurd results, the parties to the arbitration provision did not intend to enter into an agreement that

3    would cover the claim asserted against DirecTV in this action.

4           In *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016), the plaintiff (Wexler)

5    entered into a contract for her wireless telephone service with AT&T Mobility in 2008.  211 F.

6    Supp. 3d at 501.  The contract contained the same broad arbitration provision that is found in

7    Section 2.2(1) of the Customer Agreement in this case.  *Id.* at 502.  After the original term of the

8    contract expired, in 2014, Wexler continued to receive wireless service on a month-to-month

9    basis. *Id.*  In October 2014, Wexler began receiving unsolicited calls and text messages from

10   AT&T Corp. (a separate company) advertising "U-verse" television and internet services.  *Id.*  The

11   texts and calls related to another person's account;  Wexler herself never had a U-verse account.

12   *Id.* at 501–02.  Wexler brought a putative class action against AT&T Corp., which moved to

13   compel arbitration under the arbitration agreement with AT&T Mobility.   *Id.* at 501. AT&T

14   Mobility has no involvement in the U-verse service offered by AT&T Corp.  However, both

15   AT&T Mobility and AT&T Corp. are wholly-owned subsidiaries of AT&T Inc.  *Id.* at 502.  The

16   court addressed whether AT&T Corp. could enforce the arbitration agreement to compel

17   arbitration of Wexler's claim.

18          The court in *Wexler* began by noting that the arbitration agreement at issue was "strikingly

19   broad," both because it required arbitration of claims against third parties affiliated with AT&T

20   Mobility and because it purported to cover such a broad subject matter.  *Id.* at 502.  In fact, the

21   court found only one case that "squarely address[ed] an arbitration clause as broad as [AT&T

22   Mobility's]" – *In re Jiffy Lube*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012).  In that case, the court

23   "acknowledged *Concepcion*, but nevertheless concluded that an arbitration clause covering 'any

24   and all disputes' 'would clearly be unconscionable.'" *Id.* at 503 (citing *Jiffy Lube*, 847 F. Supp. 2d.

25   at 1263).  In reaching that conclusion, the court in *Jiffy Lube* cited Judge Posner's reasoning in

26   *Smith v. Steinkamp*, in which he "noted the 'absurd results' that would follow from an arbitration

27   clause not tethered to an underlying agreement."  *Id.* (citing 318 F.3d 775 (7th Cir. 2003)).

28          The court in *Wexler* agreed with the analysis in *Jiffy Lube* and *Steinkamp*, stating:

United States District Court
Northern District of California

> The Court agrees with its colleague in the Southern District of California that such clauses are cause for concern. And the same absurd results that Judge Posner posited would apply here. If Wexler were hit by a Mobility delivery van, or if she tripped over a dangerous condition in a Mobility store, her tort claim would have to go to arbitration. If she bought shares of stock in Mobility and later claimed a decrease in share price was the result of corporate malfeasance, her securities-fraud claim would have to go to arbitration. And since the arbitration clause purports to survive termination of the underlying service agreement, this obligation to arbitrate any claim whatsoever against Mobility would last forever. In fact, the absurd results are even more absurd than those posited in *Jiffy Lube* because the clause would not just cover disputes with Mobility, but would also include any dispute with any of Mobility's affiliates.

*Id*. Nevertheless, the court found that *Jiffy Lube's* holding was "in tension with *Concepcion*" to the extent the court found that the arbitration clause was invalid on the basis that it was unconscionable. *Id*. Therefore, the court in *Wexler* took a different approach, finding that the "unlimited scope" of the arbitration agreement presented a question of contract formation. *Id*. at 504.

The court in *Wexler* reasoned that "[i]t is black-letter law that an essential element of any contract is a mutual intent to be bound . . . and that there can be no contract absent a mutual intent to be bound." *Id*. (internal quotations and citations omitted). Further, while courts look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds," "the words expressed must be judged according to what an objective, reasonable person would have understood them to convey." *Id*. (internal quotations and citation omitted). Applying these principles, the court concluded:

> Notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the "terms and conditions" necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT & T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage. Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement with Mobility.

*Id*. at 505.

Finally, the court in *Wexler* explained that its analysis did not run afoul of the FAA or

23

*Concepcion*, reasoning as follows:

> The Supreme Court has said that the FAA's saving clause "preserves generally applicable contract defenses," but that "it does not suggest an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, 563 U.S. at 343, 131 S.Ct. 1740. It then held that California's ban on most class-action waivers presented such an obstacle, even though it applied generally to consumer contracts. *See id.* at 344, 131 S.Ct. 1740. It could be argued that deeming an arbitration clause unconscionable because it is too broad likewise applies a general contract defense "in a fashion that disfavors arbitration." *Id.* at 341, 131 S.Ct. 1740. The Court's reliance on the lack of mutual intent, by contrast, is entirely consistent with the FAA because "[a]rbitration under the Act is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Indeed, the FAA explicitly limits itself to agreements "to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof." 9 U.S.C. § 2 (emphasis added).

*Id.* at 504.

DirecTV attempts to distinguish *Wexler* on the basis that in that case, the unsolicited texts and telephone calls related to someone else's account and therefore had no connection to the Service agreement. In contrast, they contend, the telephone solicitations made to Revitch were connected to the Customer Agreement because he expressly consented to receive advertising about services AT&T Mobility "believe[s] may be of interest" to the customer. *See* Mittelstead Decl., Ex. 4 (Customer Agreement), § 1.4. The Court disagrees. First, nothing in the reasoning of *Wexler* suggests that this distinction has any significance. In addition, the Court rejects DirecTV's assertion that its advertising calls are more connected to Revitch's wireless service than the calls and texts in *Wexler*. While DirecTV points to Section 1.10 in support of its contention that its telephone calls constituted the sort of advertising to which Revitch consented under the Wireless Agreement, the language of the Customer Agreement does not support that conclusion. In particular, as discussed above, Section 1.10 provides, in part: "You consent to the use by *us or our authorized agents* of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advertise you [sic] about *our Services*, or other matters we believe may be of interest to you." Mittelstead Decl., Ex. 4 (Customer Agreement) § 1.10 (emphasis added). Unlike the arbitration provision, however, this section does

24

not include its own definition of "us" or "our" and there is nothing to suggest it was intended to cover advertising of unrelated services by "affiliates."  To the contrary, the use of "us" and "our" in Section 1.10 presumably falls within the general definition of those terms contained in the Preamble, which states that "'us' or 'our' refers to AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T."  *Id.*, Preamble.  As DirecTV clearly doesn't fall within this narrower definition, the advertising it aimed at Revitch does not fall within the scope of Section 1.10 and is no more connected to Revitch than the texts and telephone calls in *Wexler*.

Further, the undersigned agrees with the Court in *Wexler* that the broad interpretation of the arbitration provision advanced by DirecTV leads to absurd results. Under DirecTV's interpretation of the arbitration provision, merely by agreeing to a contract to receive wireless service a customer would agree to subject to arbitration not only disputes that might arise with the service provider relating to that service but virtually any sort of dispute the customer might have against any entity that might in the future be acquired by the holding company that owns the service provider.  No reasonable consumer would enter into such a contract.

The Court also rejects DirecTV's assertion that *Wexler* was wrongly decided and that the court's approach in that case is inconsistent with of *Concepcion*.  DirecTV relies heavily upon the Supreme Court's recent decision in *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421 (2017), arguing that it supports the conclusion that the California common law rule of interpretation that avoids absurd results  is trumped by the presumption in favor of arbitration.  In *Kindred Nursing*, the Court held that under *Concepcion* state law rules governing the *existence* of an agreement to arbitrate, like state law rules governing the scope of an arbitration agreement, may not "selectively find[ ] arbitration invalid."  137 S. Ct. at 1428.  The Court held that the Kentucky Supreme Court violated that principal when it adopted a rule – the so-called "clear statement rule" – that "hing[ed] on the primary characteristic of an arbitration agreement—namely, a waiver of the right to go to court and receive a jury trial."  *Id*.  In particular, the "clear statement rule" provided that a power of attorney containing a broad (but general) delegation of powers was not sufficient to delegate the power to enter into an arbitration agreement, which required a specific delegation

United States District Court
Northern District of California

of that power.  *Id.* at 1426.  The Kentucky Supreme Court reasoned that this heightened

requirement for delegation of the power to enter into an arbitration agreement was necessary to

"protect[] the rights of access to the courts and trial by jury."  *Id.*

Here, the common law rule requiring that contracts be construed to avoid absurd results is

generally applicable; in contrast to the rule in *Kindred Nursing*, it does not single out (either

expressly or covertly) arbitration agreements for less favorable treatment than other types of

contracts.  Further, as the court in *Wexler* pointed out, the application of the rule to arbitration

agreements is entirely consistent with the well-established principal that arbitration under the FAA

"is a matter of consent, not coercion."  *Volt Info. Scis., Inc. v. Board of Trustees of Leland*

*Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).

The Court also rejects DirecTV's assertion that to the extent the arbitration provision is

ambiguous as to whether it covers the claims asserted against it, the Court must resolve that

ambiguity in favor of arbitration rather than applying the state law rule that ambiguities must be

construed against the drafter of a contract.  As noted above, it is a general principle of California

law that where there is doubt as to the intent of the parties, ambiguities in written agreements are

to be construed against the drafters, a rule that "applies with particular force in the case of a

contract of adhesion." *See Sandquist v. Lebo Automotive, Inc.*, 1 Cal. 5th 233, 247 (2016) (citing

Cal. Cive Code § 1654; Rest. 2d. Contracts, § 206).  Further, the rule that ambiguities in contracts

are construed against the drafter has been invoked by the Supreme Court in the context of

arbitration agreements.  *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 63 (1995).

DirecTV contends this California common law rule of construction gives way to the

presumption in favor of arbitration under the FAA where the two rules are in conflict, pointing out

that in *Mastrobuono*, both rules pointed in favor of enforcing the arbitration clause that was at

issue in that case. *See* 514 U.S. at 62-63.  The Court is not persuaded by DirecTV's argument,

however. While it is true that *Mastrobuono* did not address whether the federal presumption

preempts the state common law rule requiring that ambiguities by construed against the drafter,

the Court finds that other cases elucidating the federal presumption – or the "equal footing" rule –

support the conclusion that it does not.

The Ninth Circuit has explained that the presumption in favor of arbitration "'is merely an acknowledgment of the FAA's commitment to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements *upon the same footing as other contracts*."'" *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (emphasis added) (quoting *Granite Rock*, 130 S.Ct. at 2859) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).   It does not "override[ ] the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.'"  *Id.* (quoting *First Options of Chicago, Inc. Kaplan*, 514 U.S. 938, 943 (1995)).  Further, the Supreme Court has made clear that the FAA's saving clause was intended to "make arbitration agreements as enforceable as other contracts, but not more so."  *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 404 (1967).   Were courts to ignore the common law rule construing ambiguous terms against the drafter where that rule would point away from the existence of a valid agreement to arbitrate, as DirecTV proposes, they would, in effect, be violating the Supreme Court's instructions that arbitration agreements must be on *equal* footing with other contracts, instead treating such contracts as *more* enforceable than other contracts. Further, as discussed above, such an approach flies in the face of the principle that arbitration is a matter of consent.

Accordingly, the Court concludes that the arbitration provision in the contract between Plaintiff and AT&T Mobility does not reflect an intent to arbitrate the claim Plaintiff asserts against DirecTV in this action.

## IV.    CONCLUSION

For the foregoing reasons, the Motion is DENIED. A further case management conference is set for **October 5, 2018 at 2:00 p.m**.   The parties shall file a joint case management conference statement by **September 28, 2018.**

**IT IS SO ORDERED.**

Dated:  August 23, 2018

_____

JOSEPH C.  SPERO
Chief Magistrate Judge