**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEREMY REVITCH, on behalf of himself and all others similarly situated,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>DIRECTV, LLC,<br>*Defendant-Appellant.* | No. 18-16823<br><br>D.C. No.<br>3:18-cv-01127-JCS<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Joseph C. Spero, Chief Magistrate Judge, Presiding

Submitted August 8, 2019[*]
San Francisco, California

Filed September 30, 2020

Before:  Diarmuid F. O'Scannlain, M. Margaret McKeown,
and Mark J. Bennett, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge O'Scannlain;
Dissent by Judge Bennett

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Arbitration

The panel affirmed the district court's denial of defendant DIRECTV, LLC's motion to compel arbitration pursuant to the Federal Arbitration Act in a putative class action brought under the Telephone Consumer Protection Act.

Plaintiff alleged that DIRECTV, a satellite television services company, made calls to his cell phone in violation of the TCPA. Plaintiff was a customer of AT&T Mobility, LLC, a wireless service provider, with which he signed a contract that included an arbitration clause extending to all disputes between him and AT&T. As defined in the wireless services contract, any reference to AT&T Mobility also included its "affiliates." Years later, DIRECTV was acquired by AT&T, Inc., which became the parent company of both DIRECTV and AT&T Mobility.

Disagreeing with the Fourth Circuit, the panel held that, under California contract law, looking to the reasonable expectation of the parties at the time of contract, a valid agreement to arbitrate did not exist between plaintiff and DIRECTV because DIRECTV was not an affiliate of AT&T Mobility when the contract was signed. Distinguishing *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019), the panel held that the FAA does not preempt California's "absurd results" canon, which requires that courts interpret contracts

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to avoid absurd results.  The panel concluded that the correct inquiry was whether a valid agreement to arbitrate existed between plaintiff and DIRECTV, rather than asking first, whether plaintiff and AT&T entered into a valid arbitration agreement and second, whether the scope of that agreement required plaintiff to arbitrate claims against entities like DIRECTV that later became affiliates of AT&T.

Concurring, Judge O'Scannlain wrote separately to expand upon the issue of contract scope, as distinguished from contract formation.  He wrote that, even if the panel considered the question under the rubric of scope, it would still affirm the denial of the motion to compel arbitration based on the express language of the FAA because the dispute did not "arise out of" plaintiff's contract with AT&T Mobility under 9 U.S.C. § 2.

Dissenting, Judge Bennett wrote that neither party disputed the existence and validity of the arbitration clause. Thus, the issues before the panel fell squarely within the question whether the agreement encompassed the dispute at issue.  Judge Bennett concluded that the arbitration clause's express terms encompassed the parties' dispute because "affiliates" in the clause clearly included DIRECTV. Moreover, under *Lamps Plus*, ambiguities about the scope of an arbitration clause must be resolved in favor of arbitration. Thus, even if some ambiguity existed, application of this rule of construction led to the same conclusion, that DIRECTV could compel arbitration.

4                    REVITCH v. DIRECTV

**COUNSEL**

Evan M. Tager, Archis A. Parasharami, and Daniel E. Jones, Mayer Brown LLP, Washington, D.C., for Defendant-Appellant.

L. Timothy Fisher, Joel D. Smith, and Yeremy O. Krivoshey, Bursor & Fisher P.A., Walnut Creek, California, for Plaintiff-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

An arbitration clause in a wireless services agreement purports to include all affiliates of the wireless services company. We must decide whether a satellite television company, which became an affiliate years after the agreement was signed, may use the wireless services agreement to compel arbitration in a suit brought against it under the Telephone Consumer Protection Act.

I

In 2018, Jeremy Revitch brought this putative class action against DIRECTV, LLC ("DIRECTV") under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). He alleges that DIRECTV, a satellite television services company, initiated multiple telephone calls to his cell phone using a prerecorded message. Each time, the message allegedly said:

> This is an important announcement from [DIRECTV]. We are now offering our most popular viewing package for only $19.99 per

> month. For a limited time, new customers
> also receive a free flat-screen television, just
> for signing up. Press 1 to speak with a
> representative, or press 9 to be removed from
> future offers.

Revitch avers that he had no previous contact with
DIRECTV, never provided DIRECTV with his telephone
number, and certainly did not give DIRECTV permission to
flood his cell phone with robocalls.

According to Revitch's complaint, DIRECTV has a
history of conducting unsolicited telemarketing campaigns,
for which it has been sued numerous times and has paid
millions of dollars in fines to the Federal Trade Commission.
Apparently frustrated with such spam calls, Revitch decided
to make use of the TCPA's private right of action under
47 U.S.C. § 227(b)(3). He brings this class action against
DIRECTV on behalf of all persons in the United States who
have received prerecorded messages from the company over
the last four years without prior express written consent.

## A

Faced with this lawsuit, DIRECTV somehow uncovered
the fact that Revitch also happens to be a customer of AT&T
Mobility LLC ("AT&T Mobility"), a wireless services
provider, with which he signed a contract when he upgraded
his mobile device in 2011, seven years before. That contract
for mobile phone wireless services included an arbitration
clause extending to "all disputes and claims between"
Revitch and AT&T Mobility, "includ[ing], but . . . not
limited to . . . claims arising out of or relating to any aspect
of the relationship between" them. As defined in Revitch's
wireless services contract, any references to AT&T Mobility
also include its "affiliates."

So how did this class action morph into a compulsory arbitration appeal? It turns out that DIRECTV was acquired in 2015 by AT&T, Inc., which is now the parent company of both DIRECTV and AT&T Mobility. Thus, DIRECTV contends that it has become an "affiliate" of AT&T Mobility within the meaning of the wireless services agreement and should therefore be able to piggyback onto the arbitration clause, notwithstanding that it was not an affiliate at the time Revitch signed the wireless services contract with AT&T Mobility four years earlier. Soon after Revitch filed his complaint, DIRECTV filed a motion to compel arbitration of Revitch's putative class action pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA" or "the Act").

B

In a twenty-seven-page order entered on behalf of the district court, Chief Magistrate Judge Joseph C. Spero denied DIRECTV's motion, concluding that the contract between Revitch and AT&T Mobility did not reflect an intent to arbitrate the claim that Revitch asserts against DIRECTV.

DIRECTV now appeals the order denying its motion to compel arbitration.

II

When a motion to compel arbitration is filed, a "court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Because "the Act leaves no place for the exercise of discretion by a district court," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213,

REVITCH V. DIRECTV                              7

218 (1985), a federal court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue," *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the answer to both questions is yes, then the FAA requires a court "to enforce the arbitration agreement in accordance with its terms." *Id.*; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." (emphasis in original)).[1]

### A

Does a valid agreement to arbitrate exist between Revitch and DIRECTV?[2]

---

[1] The Revitch-AT&T Mobility wireless services agreement provides that "issues relating to the scope and enforceability of the arbitration provision are for the court to decide." Thus, it is unquestionably the responsibility of the court—not the arbitrator—to resolve this case.

[2] The dissent argues that this is the "wrong question" to ask, and that instead, we should proceed by asking first "[w]hether Revitch and AT&T entered into a valid arbitration agreement," then subsequently "[w]hether the scope of that agreement requires Revitch to arbitrate claims against entities (like DIRECTV) that later became affiliates of AT&T." Dissent at 28 n.6.

We respectfully disagree.

It is a longstanding maxim of California law that for a nonsignatory party to enforce a contract as a third-party beneficiary, that party must

8                    REVITCH V. DIRECTV

To answer the question, we look to state contract law. *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998). Because the wireless services agreement's choice-of-law provision states that the contract is governed by the law of the state in which the customer's billing address is located, we apply the law of Revitch's home state of California.

In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. We normally determine the mutual intention of the parties "from the written terms [of the contract] alone," so long as the "contract language is clear and explicit and does not lead to absurd results." *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 652 (Ct. App. 2007); *see also* Cal. Civ. Code §§ 1638 ("The language of a contract is to govern its

---

do so on a theory that "the law [has] establish[ed] a *privity*, and implie[d]" a mutual "promise and obligation," between the nonsignatory party and the signatory party against whom it seeks enforcement. *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 470 (Ct. App. 2009) (emphasis added) (quoting *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 325 P.2d 193, 197 (Cal. Ct. App. 1958) (citing *Washer v. Indep. Mining & Dev. Co.*, 76 P. 654, 657 (Cal. 1904))). In other words, our determination of whether DIRECTV can avoid the "general rule that one must be a party to an arbitration agreement to invoke it," *DMS Servs., LLC v. Super. Ct.*, 140 Cal. Rptr. 3d 896, 901 (Ct. App. 2012), hangs *precisely* on the question of whether the "operati[on]" of law has "establish[ed] a privity," *Spinks*, 90 Cal. Rptr. 3d at 470, between Revitch and DIRECTV.

Moreover, it bears noting that in *Mey v. DIRECTV, LLC*—which is relied upon heavily throughout the dissent—the Fourth Circuit expressly framed the relevant question as whether a plaintiff (who had signed the same AT&T wireless services contract as Revitch) could be said to have "formed an agreement to arbitrate *with DIRECTV*." __ F.3d __, 2020 WL 4660194, at *1 (4th Cir. 2020) (emphasis added).

interpretation, if the language is clear and explicit, and does not involve an absurdity."), 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ."). The relevant words of the wireless services agreement are: "References to 'AT&T,' 'you' and 'us' include our respective . . . affiliates . . . ."

We must thus decide whether DIRECTV qualifies as an "affiliate" of AT&T Mobility, as the term is used in the wireless services agreement. Because the word is not elsewhere defined in the contract, we rely on the ordinary definition. *See* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning . . . ."). An affiliate is normally understood as "a company effectively controlled by another or associated with others under common ownership or control." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Webster's Third New International Dictionary 35 (2002)); *see also* Cal. Corp. Code § 150 ("A corporation is an 'affiliate' of . . . another specified corporation if it . . . is under common control with the other specified corporation."). Because DIRECTV and AT&T Mobility are under common ownership by AT&T, Inc. today, they are affiliates.

DIRECTV would have us end the inquiry right here. It does not matter, DIRECTV argues, that it was not an affiliate at the time Revitch and AT&T Mobility entered into their contract and that it became an affiliate years later following a corporate acquisition that had nothing to do with Revitch or his wireless services agreement. However, as we already mentioned, we rely on the "written terms alone" when the "contract language is clear and explicit and *does not lead to*

*absurd results*." *Kashmiri*, 67 Cal. Rptr. 3d at 652 (emphasis added). Here, absurd results follow from DIRECTV's preferred interpretation: Under this reading, Revitch would be forced to arbitrate any dispute with any corporate entity that happens to be acquired by AT&T, Inc., even if neither the entity nor the dispute has anything to do with providing wireless services to Revitch—and even if the entity becomes an affiliate years or even decades in the future. The Eastern District of New York, addressing a similar set of facts in *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016), concluded that "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them [sic] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT&T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage." We agree.

"[W]e look to the reasonable expectation of the parties at the time of contract." *Kashmiri*, 67 Cal. Rptr. 3d at 652. We also may explain a contract "by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647. Here, when Revitch signed his wireless services agreement with AT&T Mobility so that he could obtain cell phone services, he could not reasonably have expected that he would be forced to arbitrate an unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated with AT&T until years later. Accordingly, we are satisfied that a valid agreement to arbitrate between Revitch and DIRECTV does not exist.

Had the wireless services agreement stated that "AT&T" refers to "any affiliates, both present and future," we might

arrive at a different conclusion. However, absent this or similar forward-looking language, we are convinced that the agreement does not cover entities that became affiliated with AT&T Mobility years after the contract was signed in an unrelated corporate acquisition. *See Unova, Inc. v. Acer Inc.*, 363 F.3d 1278, 1282 (Fed. Cir. 2004) (interpreting California law and holding that a release from liability provision "written in the present tense . . . most naturally does not refer to [a party's] future parents"); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) ("The Release's reference to 'affiliates' . . . [is] stated in the present tense. Nothing . . . indicates the inclusion of future rather than present members."); *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1004 (N.Y. 2014) ("Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed.").

Because it was not and is not now a party to the wireless services agreement between Revitch and AT&T Mobility, DIRECTV may not invoke the agreement to compel arbitration. *DMS Servs.*, 140 Cal. Rptr. 3d at 900.

## B

DIRECTV contends that the FAA preempts the absurd-results canon and, as a result, we must enforce the arbitration clause. Although the FAA preserves generally applicable contract defenses to arbitration agreements, 9 U.S.C. § 2, the Supreme Court has held that even such defenses which "have a disproportionate impact on arbitration agreements" or "have been applied in a fashion that disfavors arbitration" are preempted by the FAA, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341–42 (2011). Recently, in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019),

the Court held that the FAA preempts California's *contra proferentem* rule—requiring ambiguities in a contract to be construed against the drafter—when the rule is used "to impose class arbitration in the absence of the parties' consent." DIRECTV argues that *Lamps Plus* is dispositive in this case because it stands for the proposition that ambiguities must be resolved in favor of arbitration. Consequently, DIRECTV claims, any ambiguity about whether it is an "affiliate" of AT&T Mobility must be resolved in favor of arbitration.

We disagree with DIRECTV's interpretation of *Lamps Plus* and its application to the present case. The problem with *contra proferentem*, according to the Supreme Court, is that it is a "default rule" that is "triggered only after a court determines that it *cannot* discern the intent of the parties." *Id.* at 1417 (emphasis in original). The rule is distinguishable from other "contract rules that help to interpret the meaning of a term, and thereby uncover the intent of the parties." *Id.* By contrast, we use the absurd-results canon to discern the mutual intent of the parties based on their reasonable expectations at the time of contract.

DIRECTV fails to show that California's absurd-results canon disfavors arbitration agreements compared to other contracts. The FAA's savings clause was intended to "make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). Accordingly, we are not persuaded that the FAA preempts California's rule requiring that courts interpret contracts to avoid absurd results.[3]

---

[3] Contrary to the dissent's characterization, our conclusion that DIRECTV's preferred interpretation of the contract is absurd has nothing

C

The dissent agrees with DIRECTV that the question of whether Revitch is an affiliate of AT&T Mobility under the wireless services agreement is a matter of the contract's scope to be resolved at the second step of our FAA analysis, not a matter of contract formation to be resolved at the first. Dissent at 28–29.

We think that DIRECTV's preferred framework for resolving this case is a misreading of our precedents. We determine "(1) whether a valid agreement to arbitrate exists" and "(2) whether the agreement encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130. Here, the question we must answer is whether the arbitration clause in the Revitch-AT&T Mobility wireless services contract is a valid agreement between Revitch and DIRECTV to arbitrate their disputes. Nothing in our precedents requires that we answer that question at step two rather than step one.

We also think that DIRECTV's preferred framework would subvert the Supreme Court's FAA jurisprudence, which emphasizes that "[a]rbitration is strictly 'a matter of consent . . . .'" *Granite Rock*, 561 U.S. at 299 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior*

---

to do with the relative merits of arbitration compared to litigation. Dissent at 30. We are merely following the Supreme Court's command that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Interpreting Revitch's agreement to arbitrate a dispute with AT&T Mobility as a consent to arbitrate any and all disputes with unknown corporate entities to be acquired by AT&T, Inc. years in the future is undoubtedly absurd. We are not persuaded by the dissent's argument that the absurd-results canon is inapplicable in this extreme case.

*Univ.*, 489 U.S. 468, 479 (1989)). Because "any doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (emphasis added), it follows that if we were always to treat the question of who is a party to a contract as a matter of scope, then in turn, we would be required always to err on the side of accepting individuals or entities as parties who could invoke an arbitration clause, even if the other party would never have consented to such an arrangement when it entered into the contract.

We are not persuaded by DIRECTV's argument that we must evaluate Revitch's claim against it as a matter of the scope of the contract between Revitch and AT&T Mobility.

## D

We are aware that the Fourth Circuit, considering a recent case presenting facts and issues substantially similar to those presented here (including, most pertinently, an arbitration clause identical to that signed by Revitch), has arrived at the opposite conclusion. *See Mey v. DIRECTV, LLC*, __ F.3d __, 2020 WL 4660194 (4th Cir. Aug. 7, 2020). Moreover, we are aware that with our decision today, we are opening a circuit split on this difficult issue: Can anything less than the most explicit "infinite language" in a consumer services agreement bind the consumer to arbitrate any and all disputes with (yet-unknown) corporate entities that might later become affiliated with the service provider—even when neither the entity nor the dispute bear any material relation to the services provided under the initial agreement? *See* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 670–78 (2020).

Much of the Fourth Circuit's reasoning in *Mey* tracks that of the dissent here, and as such is already addressed in our foregoing analysis. There is, however, one particular point in the *Mey* opinion which does merit additional attention. Namely, the majority in *Mey* contends that in evaluating the soundness of DIRECTV's preferred interpretation of the arbitration clause, it would be inappropriate for a court to consider the "troubling hypothetical scenarios" to which such an interpretation could give rise. __ F.3d __, 2020 WL 4660194, at *7. For that contention, the Fourth Circuit relies on *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 878 (8th Cir. 2018), which it characterizes as "rejecting interpretation by hypothetical in favor of looking 'to the underlying factual allegations'" in the case at bar, *Mey*, __ F.3d __, 2020 WL 4660194, at *7. But we understand *Parm* to stand for a narrower proposition, and one that is ultimately inapposite here.

In *Parm*, it was uncontroverted that a valid agreement to arbitrate had been *formed* between the parties; the issue presented was limited to that of whether the "plaintiffs' claims f[e]ll within the *scope* of [those] arbitration clauses." 898 F.3d at 871 (emphasis added). In *that* context, the "glaring issue" with the plaintiffs' use of hypotheticals was "that they in no way inform the question before the court because we must 'look ... to the underlying factual allegations [in the case actually at bar] and determine whether *they* fall within the *scope* of the arbitration clause.'" *Id.* at 878 (quoting *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008)) (emphasis added). Because "doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25 (emphasis added), the Eighth Circuit reasoned that it would be inappropriate to consider

hypothetical horribles in order to find "a way to interpret the claims as falling outside the scope of the agreements," *Parm*, 898 F.3d at 878. Yet here, as we have explained, the issue is not one of agreement *scope*, but one of agreement *formation*.

Within *this* context, our consideration of hypotheticals serves an altogether different purpose, and one which very much *does* inform the question now before the court. Like the court in *Wexler*, 211 F. Supp. 3d at 502–503, we employ hypotheticals to discern whether the mutual intent of the parties could have been to *form* an agreement to arbitrate any and all disputes that might ever arise between Revitch and yet-unknown affiliates such as DIRECTV, no matter how unrelated to AT&T Mobility's provision of cellular phone service, including but not limited to the TCPA claim presented here. Had that been the parties' intent, as DIRECTV argues it was, it would necessarily mean that the parties intended to agree to arbitrate the "tort claim[s]" that would arise "[i]f [Revitch] were hit by a [DIRECTV] delivery van, or if [he] tripped over a dangerous condition in a [DIRECTV] store," or the "securities-fraud claim" that would arise if Revitch "bought shares of stock in [DIRECTV] and later claimed a decrease in share price was the result of corporate malfeasance." *Id.* at 503. These hypotheticals merely serve to bolster our conclusion that the parties' intention—based on their reasonable expectations at the time of contract—was *not* to form an arbitration agreement of the kind that DIRECTV would now have us read into the contract.

### III

No one disputes that arbitration clauses subject to the Act must be enforced in federal courts. But we are mindful that arbitration is a matter of consent, and we conclude that

DIRECTV has failed to establish that Revitch consented to arbitrate this pending dispute.**⁴**

The district court's denial of the motion to compel arbitration is **AFFIRMED**.

---

O'SCANNLAIN, Circuit Judge, concurring:

I write separately to expand upon the issue of contract scope, as distinguished from contract formation. Even if we consider the question under the rubric of scope, I respectfully suggest that we would still affirm the denial of the motion to compel arbitration based on the express language of the Federal Arbitration Act ("FAA," or "the Act") itself. The dispute between DIRECTV and Revitch in this case simply does not "aris[e] out of" Revitch's contract with AT&T Mobility. 9 U.S.C. § 2.

## I

Although our "authority under the [Federal] Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). We are bound by the terms of the Act, including § 2, which provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of* such contract or transaction . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2 (emphasis

---

**⁴** Whatever compulsory arbitration rights DIRECTV may have under California law, *see* Cal. Civ. Proc. Code § 1281, they are irrelevant to this appeal. DIRECTV brought its motion to compel arbitration under federal law, not state law.

added). Significantly, the controversy that is to be settled by arbitration must be one "arising out of" the contract or transaction. By negative implication, the FAA does not require the enforcement of an arbitration clause to settle a controversy that does *not* arise out of the contract or transaction.

What does it mean that a controversy must be one "arising out of" the contract or transaction?[1]

### A

Remarkably, the "arising out of" language in § 2 has generated little judicial attention. Indeed, in my research thus far, I have been unable to find any case that explains it.[2] In

---

[1] There may be some ambiguity in § 2's requirement that the controversy to be arbitrated must arise out of "such contract or transaction." Here, the word "transaction" might refer to a "maritime transaction" and "contract" to a commercial transaction. However, "transaction" could also be read to mean the commercial transaction that is the subject of the contract. The latter interpretation suggests that the FAA has a broader scope because it encompasses controversies that may not arise out of the contract but do arise out of the underlying commercial transaction. A leading paper on this subject argues for the narrower reading. *See* Stephen E. Friedman, *The Lost Controversy Limitation of the Federal Arbitration Act*, 46 U. Rich. L. Rev. 1005, 1041–44 (2012). It suggests that if "transaction" referred to the commercial transaction, "then there would be no reference to controversies arising from the maritime transaction, even though Congress obviously intended to include such controversies within the scope of the FAA." *Id.* at 1043. Such issue need not be resolved here, as it likely would not change the outcome in this case.

[2] One of our sister circuits has expressly stated—in direct contradiction of the text of the statute—that a controversy need not "aris[e] out of" the contract or transaction for the FAA to apply. In *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 333 (10th

the absence of such guidance, I have no choice but to look to other sources.

In the context of an insurance policy, one of our sister circuits has interpreted "arising out of" to mean "originating from," "having its origin in," "growing out of," "flowing from," and "incident to, or having connection with." *Red Ball Motor Freight, Inc. v. Emp'rs. Mut. Liab. Ins. Co. of Wis.*, 189 F.2d 374, 378 (5th Cir. 1951); *see also Rouse v. Greyhound Rent-A-Car, Inc.*, 506 F.2d 410, 414 n.3 (5th Cir. 1975) ("The term 'arising out of' is ordinarily understood to mean originating from, incident to, or connected with the item in question."). Our Court has relied on this definition when construing a similar term, "arising from," in insurance policies, *see Cont'l Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985); *Underwriters at Lloyd's of London v. Cordova Airlines, Inc.*, 283 F.2d 659, 664 (9th Cir. 1960), and in a provision of the U.S. Bankruptcy Code, *see In re Tristar Esperanza Props., LLC*, 782 F.3d 492, 497 (9th Cir. 2015).

We have held that "arising from" is broad in scope— broader, even, than the term "caused by." *Cont'l Cas. Co.*, 763 F.2d at 1080. However, we have never interpreted either "arising from" or "arising out of" so broadly such that there need not be any relationship whatsoever between the original contract or event and the resulting controversy. In *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d

---

Cir. 1993), the Tenth Circuit held that the FAA "cover[s] agreements to arbitrate a dispute not arising out of the contract containing the arbitration agreement so long as the other requirements of the Act are satisfied." Because "we are obliged to give effect, if possible, to every word Congress used," I am not persuaded by the Tenth Circuit's decision to ignore the controversy limitation in the text of § 2. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).

1458, 1463 (9th Cir. 1983), we held that an arbitration clause using the language "arising under the contract" does not encompass "matters or claims independent of the contract or collateral thereto." Instead, such an arbitration clause covers only those disputes "relating to the interpretation and performance of the contract itself." *Id.* at 1464. We later interpreted the phrase "arising out of" to have the same scope as "arising under." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994).

Applying these principles to the language of § 2 of the Act, when it requires that the controversy be one "arising out of" the contract or transaction, it, at a minimum, must exclude claims that are completely unrelated to the underlying contract or transaction.

### B

Because the Supreme Court has applied the FAA quite frequently and in a variety of controversies without ever addressing the "arising out of" language in § 2, one might assume that the limitation has fallen into desuetude and that, consequently, relying on it now would conflict with the Court's arbitration jurisprudence. However, in my research thus far, I have not found that to be the case; instead, it appears that there is always some relationship between the controversy and the underlying contract.

For example, in some of the Court's typical arbitration cases, the controversy was a defect in contract formation. The defendant moved to compel arbitration based on a provision in that same contract. *See CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97 (2012) (individuals who applied for a credit card accused the credit card company and bank of making misleading representations about the benefits of obtaining the card); *AT&T Mobility LLC v.*

*Concepcion*, 563 U.S. 333, 337 (2011) (new customers accused a wireless services company of false advertising and fraud).

In other cases, one of the parties allegedly breached a contract and, when faced with arbitration, asked a court to declare that the arbitration clause in the contract was unenforceable. *See Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 18 (2012) (former employees allegedly violated their employment contract by working for a competitor); *Preston v. Ferrer*, 552 U.S. 346, 350 (2008) (plaintiff allegedly did not pay fees due under a service contract).

Finally, in many of the Court's arbitration cases, the plaintiff sued the defendant for some type of foreseeable misconduct that occurred during the course of performing the contract. The defendant then moved to compel arbitration based on an arbitration clause in that contract. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1620 (2018) (employer accused of violating the Fair Labor Standards Act and California law by misclassifying and underpaying its employees demanded arbitration pursuant to the employment contracts); *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1425 (2017) (nursing home accused of delivering substandard care that caused the deaths of residents demanded arbitration pursuant to the nursing home service contracts); *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 466 (2015) (satellite television services company accused of charging early termination fees in violation of California law demanded arbitration pursuant to the service contract); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 231 (2013) (credit card company accused of violating antitrust laws by forcing merchants to accept significantly higher rates demanded arbitration pursuant to contracts with those merchants); *Marmet Health Care Ctr., Inc. v. Brown*,

565 U.S. 530, 531–32 (2012) (nursing homes accused of negligently causing injuries resulting in deaths of residents demanded arbitration pursuant to nursing home service contracts); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442–43 (2006) (lender accused of charging usurious interest rates in violation of Florida lending and consumer-protection laws demanded arbitration pursuant to its loan agreements with the borrowers).

However, I have been unable to locate any case in which the Supreme Court enforced an arbitration clause when the underlying claim was wholly unrelated to the contract in which the clause was contained. Functionally, the "arising out of" language in § 2 appears to serve as a boundary to the types of controversies that are covered by the FAA: Federal courts are required to compel arbitration for those controversies that actually stem from the contract containing the arbitration clause. But when the dispute is wholly unrelated to the contract, the FAA is silent; federal courts have no power to compel arbitration. *See* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 678–83 (2020); Friedman, *supra* n.1, at 1006.

Focusing on the "arising out of" language as a boundary to the types of disputes that are covered by the FAA is in keeping with other guidance that we have received from the Supreme Court, as well as our own approach to statutory construction. "Arbitration under the Act is a matter of consent . . . ." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). A party can hardly be said to consent to arbitrate disputes that have nothing at all to do with the subject of the contract the party signed or the provider-customer relationship the contract creates, let alone a claim against an entity not even in parity at the time.

REVITCH V. DIRECTV                      23

## II

So, is Revitch's Telephone Consumer Protection Act class action suit against DIRECTV one "arising out of" Revitch's wireless services contract with AT&T Mobility within the meaning of § 2 of the Act? I conclude the answer is no.

The AT&T Mobility arbitration clause is undoubtedly written in broad terms, but it resides in the wireless services form contract that it imposed on Revitch at the time he upgraded his mobile device. Thus, the pertinent relationship it covers is that by which AT&T Mobility (or its "affiliates") provides Revitch with *wireless services*. Within this umbrella, the arbitration clause is indeed broad. Undoubtedly, it requires arbitration of a host of disputes that might arise between AT&T and Revitch, including, for example, defective cell phone reception or failure to pay monthly charges. But DIRECTV's decision to send Revitch unsolicited advertisements for its *satellite television* products—thereby allegedly violating the Telephone Consumer Protection Act—does not in any way involve the formation or performance of a contract for wireless services between Revitch and AT&T Mobility.

In my view, we can affirm the district court on the separate ground that the controversy between DIRECTV and Revitch does not come within the Federal Arbitration Act since it does not "aris[e] out of" the contract between Revitch and AT&T Mobility.

BENNETT, Circuit Judge, dissenting:

Neither party disputes the existence and validity of the arbitration clause on which DIRECTV, LLC ("DIRECTV") relies. Thus, the issues before us fall squarely within the second question we consider when analyzing an arbitration agreement under the Federal Arbitration Act ("FAA")—"whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). I respectfully dissent because the arbitration clause's express terms encompass the parties' dispute. "Affiliates" in the arbitration clause clearly includes DIRECTV, so DIRECTV may invoke it to compel arbitration. Moreover, the Supreme Court has instructed "that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019). Even if some ambiguity exists, applying this simple rule of construction leads to the same conclusion—DIRECTV may compel arbitration here.

I agree with the majority that (1) DIRECTV is currently an affiliate of AT&T Mobility LLC ("AT&T") and (2) our inquiry into whether DIRECTV may enforce the arbitration clause against Jeremy Revitch requires us to determine whether the word "affiliates" includes entities who became affiliates of AT&T after Revitch signed his wireless services contract. This is where my agreement with the majority ends.

I start with the text of the arbitration clause: "AT&T and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to . . . claims arising out of . . . any aspect of the relationship between us, whether based in . . . statute . . . or any other legal theory." The arbitration clause also provides: "References to 'AT&T,'

'you' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us."

Nothing in the arbitration clause or in the dictionary definition of the word "affiliate" confers any type of temporal scope to the term so that "affiliates" should be read to refer only to *present* affiliates.[1] DIRECTV is therefore an affiliate within the explicit language of the arbitration clause.[2] Because Revitch agreed to arbitrate "all disputes and claims," including statutory claims, between him and DIRECTV, DIRECTV may compel arbitration under the agreement. Our inquiry should end there.[3]

---

[1] *See* Maj. Op. at 9 (citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Webster's Third New International Dictionary 35 (2002)) and Cal. Corp. Code § 150).

[2] The Fourth Circuit recently came to this conclusion when considering an identical arbitration clause in *Mey v. DIRECTV, LLC*, __ F.3d __, 2020 WL 4660194 (4th Cir. 2020): "Mey does not advance any reason we should restrict the ordinary meaning of 'affiliates' here, nor do we find any. The agreement contains no explicit limitation on the term [affiliates]." *Id.* at *4.

[3] The arbitration clause provides that "AT&T" (defined as including affiliates like DIRECTV) "may commence an arbitration proceeding." Given this express contractual language, we need not resort to different "operation[s] of law," as suggested by the majority, to determine whether DIRECTV may invoke the arbitration agreement. *See* Maj. Op. at 7–8, n.2; *cf. Spinks v. Equity Residential Briarwood Apts.*, 90 Cal. Rptr. 3d 453, 473 (Ct. App. 2009) ("Because resort to the contract language alone does not resolve the question of plaintiff's status, we look to the circumstances surrounding the formation and performance of the [contract].").

But even were we to go further, other language in the arbitration clause shows that the parties did not intend to place a temporal limitation on "affiliates." Indeed, the arbitration clause expressly contemplates coverage of some persons and entities that were unconnected with AT&T when Revitch entered into the contract. "[P]redecessors in interest" looks backward. "[S]uccessors" and "assigns" look forward. The arbitration clause also refers to other types of persons and entities that have no explicit temporal limitations—"subsidiaries," "agents," and "employees." No one would suggest that the arbitration clause applied only to those who were, for example, AT&T's agents or employees at the time of contracting, as opposed to those who became AT&T's agents or employees a week, a month, or several years later. This language shows that the parties did not intend for the arbitration clause to cover only entities connected to AT&T at the time of contracting.[4] Other language in the arbitration clause also counsels against construing "affiliates" as temporally limited. Significantly, the agreement provides: "This agreement to arbitrate is intended to be broadly interpreted." Restricting "affiliates" to only current affiliates at the time of contracting would be inconsistent with the parties' express agreement to construe the arbitration clause broadly. *Current affiliates* is obviously less broad than *affiliates*. The arbitration clause also contains

---

[4] Similar to Revitch, the plaintiff in *Mey* argued "that 'affiliates' should be limited to affiliates existing at the time the contract was signed." *Mey*, 2020 WL 4660194, at *4. The majority in *Mey* disagreed, pointing to "successors" and "assigns" as entities "whose identities cannot be known until some point in the future." *Id.* at *5. It also noted that the identities of affiliates, subsidiaries, agents, and employees "are subject to change over the period in which a customer uses the service." *Id.* "In light of the forward-looking nature of the agreement, it is unlikely the parties intended to restrict the covered entities to those existing at the time the agreement was signed." *Id.*

forward-looking provisions. The arbitration clause applies to "claims that may arise after the termination of this Agreement," and the "arbitration provision shall survive termination of this Agreement." These forward-looking provisions are entirely consistent with interpreting "affiliates" to include entities like DIRECTV that associated with AT&T after Revitch contracted with AT&T.

In sum, nothing in the contract language, including the language surrounding the term "affiliates," supports rewriting the contract to import a temporal limit into the meaning of "affiliates." DIRECTV, as an affiliate of AT&T, may therefore enforce the arbitration agreement.

But for argument's sake, let's assume that "affiliates" does not clearly encompass AT&T's future affiliates.[5] The above analysis shows that, at the very least, it is reasonable to read "affiliates" as including future affiliates, given the ordinary meaning of the term and the context in which it is used. Let's then assume that it would also be reasonable to interpret "affiliates" as referring to only those entities that were affiliated with AT&T at the time of contracting. Under this hypothetical, there are two or more reasonable constructions of "affiliates," rendering the scope of the term ambiguous. *See Benach v. County of Los Angeles*, 57 Cal. Rptr. 3d 363, 372 (Ct. App. 2007) ("Ambiguity exists when a contractual provision is susceptible of two or more reasonable constructions.").

---

[5] The Fourth Circuit did not address construction arguments related to ambiguity, because the "ordinary meaning of 'affiliates' and the contractual context convince[d the majority] that the term includes affiliates acquired after the agreement was signed." *Mey*, 2020 WL 4660194, at *5.

The Supreme Court has made it clear that "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). If "the problem at hand is the construction of the contract language itself," then "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). If "affiliates" *is* ambiguous, then these Supreme Court commands would require us to construe "affiliates" broadly as including entities that became affiliated with AT&T after Revitch and AT&T entered into their contract. *See Lamps Plus*, 139 S. Ct. at 1418 ("[A]mbiguities about the scope of an arbitration agreement must be resolved in favor of arbitration.").

The majority avoids this result by incorrectly framing the issue as one of contract existence and then invoking what it calls the "absurd-results canon."[6] First, Revitch does not dispute the existence of the arbitration agreement, so the issue before us is one of scope—"whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130; *see also Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) ("Where the arbitrability of a dispute is contested, we must decide whether the parties

---

[6] The majority asks and then answers the wrong question. It essentially asks whether Revitch and DIRECTV are parties to a contract. But DIRECTV never claims it entered into any contract with Revitch—AT&T entered into the contract with Revitch. The right questions are: 1) Whether Revitch and AT&T entered into a valid arbitration agreement (answer-Yes); and 2) Whether the scope of that agreement requires Revitch to arbitrate claims against entities (like DIRECTV) that later became affiliates of AT&T (answer-Yes).

are contesting the *existence* or the *scope* of an arbitration agreement.").

Second, the absurd-results canon cited by the majority applies only if there is an ambiguity. In *Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635 (Ct. App. 2007), the case cited by the majority, the California Court of Appeal cited California Civil Code §§ 1638 and 1639 to support its statement that "[w]here contract language is clear and explicit and does not lead to absurd results, we normally determine intent from the written terms alone." *Id.* at 652. The majority also cites California Civil Code §§ 1638 and 1639 to support its application of the absurd-results canon.[7] But the code section immediately preceding those sections provides: "For the purpose of ascertaining the intention of the parties to a contract, *if otherwise doubtful*, the rules given in this Chapter are to be applied." Cal. Civ. Code § 1637 (emphasis added). Thus, under California law, the absurd-results canon comes into play *only* if there is ambiguity. *See Eaton v. Thieme*, 59 P.2d 638, 640 (Cal. Dist. Ct. App. 1936) ("We emphasize the words of [section 1637] 'if otherwise doubtful' since they plainly exclude the application of the rules referred to if the intention of the parties to the contract is plain upon its face."); *see also Kashmiri*, 67 Cal. Rptr. 3d at 660–63 (finding first that the disclaimer language was ambiguous and then finding it necessary to turn to standard rules of contract interpretation, including the absurd-results rule, to determine the parties' reasonable expectations).

---

[7] California Civil Code § 1638 provides: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." California Civil Code § 1639 provides: "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title."

Because "affiliates" unambiguously includes DIRECTV, the absurd-results canon is inapplicable.

Though I think there is no ambiguity here, even if there were, we do *not* first look to California law, we first look to the FAA and the Supreme Court's direction: "[T]he FAA provides the default rule for resolving certain ambiguities in arbitration agreements. For example, we have repeatedly held that ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus*, 139 S. Ct. at 1418.

The majority's failure to acknowledge that the Supreme Court's direction trumps the California canon is problem enough. But that is not the most fundamental problem with the majority's position. The absurd-results canon, of course, requires absurdity. This is the supposed absurdity:

> Here, absurd results follow from DIRECTV's preferred interpretation: Under this reading, Revitch would be forced to arbitrate any dispute with any corporate entity that happens to be acquired by AT&T, Inc., even if neither the entity nor the dispute has anything to do with providing wireless services to Revitch—and even if the entity becomes an affiliate years or even decades in the future.

Maj. Op. at 10. The "absurdity" identified by the majority is being "forced to arbitrate." Put differently, in the majority's view, the absurdity apparently results from Revitch being forced to give up the rights and benefits of the "superior" forum—the courtroom and the jury—and to litigate in the "inferior" arbitral forum. Why else would it be "absurd" for a party to have agreed to a very broad, forward-looking

arbitration clause? This application of California's absurd-results canon runs afoul of *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), as the majority applies the canon "in a fashion that disfavors arbitration." *Id.* at 341.[8]

In sum, the majority's reliance on California's absurd-results canon is problematic for several reasons. First, the canon applies only if there is an ambiguity. Because "affiliates" clearly includes future affiliates, there is no ambiguity, and the canon is inapplicable. Second, even assuming "affiliates" is ambiguous, the canon is inapplicable because the Supreme Court has instructed that "the FAA provides the default rule" in construing ambiguities about the scope of arbitration agreements and that we must "resolve[] [those ambiguities] in favor of arbitration." *Lamps Plus*, 139 S. Ct. at 1418. Finally, the majority's application of the canon contravenes Supreme Court precedent as it applies the rule in a way that disfavors arbitration. *See Concepcion*, 563 U.S. at 341–42.

For these reasons, I respectfully dissent.

---

[8] The majority's discussion of hypotheticals confirms that it invokes a canon of construction "in a fashion that disfavors arbitration," running afoul of *Concepcion*, 563 U.S. at 341. *See* Maj. Op. at 16. Indeed, the conclusion that Revitch could not have intended to agree to a broad arbitration clause must stem from the inappropriate view that Revitch could not have agreed to a broad arbitration clause because the arbitral forum is "inferior" to the courtroom.

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                    **Date**

*(use* "s/[typed name]" *to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| | | | **TOTAL:** | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*